In re Estate of Mary Yorke, deceased.  Appeal of Mary Kingsley et al.

*Will—Issue devisavit vel non—Testamentary capacity.*

An unmarried woman, eighty-six years old, with impaired vision, but very alert and of clear understanding, executed a codicil under which a certain niece was made the principal beneficiary. The husband of the neice, who was the decedent's confidential adviser, drew the codicil according to instructions given by the decedent, but he was not present at its execution. It was executed in the presence of the family physician and another physician, a stranger, and these two physicians were the subscribing witnesses. After its execution it was placed in a box in a trust company, where it remained until decedent's death two years afterwards. Before the codicil was made, the niece, when single, had lived with her aunt, and afterwards frequently visited her until her death. On an application by another niece for an issue devisavit vel non, it was *held,* (1) that the burden of proof was upon the contestants to show undue influence; (2) that the evidence was insufficient to justify the award of an issue.

Argued Jan. 26, 1896. Appeal, No. 195, Jan. T., 1897, by Mary Kingsley, from decree of O. C. Phila. Co., July T., 1895, No. 205, refusing to award an issue devisavit vel non. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Application for an issue devisavit vel non.

The opinion of the court by HANNA, P. J., was as follows:

The rule by which the courts are to be guided in determining whether an issue shall be granted to test the validity of a last will and testament upon either the alleged absence of testamentary capacity or fraud or other undue influence exerted upon a mind of a testator is now settled by a long line of decisions by the Supreme Court, and which have been followed by this court. It is not sufficient merely to aver that the testator was of unsound mind and mentally incapable of the execution of a will, or that undue influence was used to procure its execution to entitle a party contestant to an issue. The averments must be supported by evidence sufficient to create a conflict of evidence, and dispute as to material facts. As remarked by GIBSON, C. J., in Wikoff's Appeal, 15 Pa. 289, "It would be absurd to incur

the costs of a trial when there is nothing to try." To the same effect is Knight's Appeal, 19 Pa. 493, and Dean v. Fuller, 40 Pa. 474. So that the doctrine is now well established, from Bradford's Will, 1 Parsons' Select Cases, 153, to Miller's Appeal, 179 Pa. 645, the latest case upon the subject, that, upon an appeal from the register, not only must there be a conflict of testimony upon a material fact in dispute to warrant the granting of an issue, but from a wise and beneficent care for the interests of all the parties whereby they are saved from the annoyance, trouble, expense and uncertainty of a trial before a jury, "in the hope that some feeling in favor of equality among the next of kin would influence them to set it aside : " Graham's Appeal, 61 Pa. 43. " The evidence must be such that if an issue be granted and a jury should find a verdict against the will, we, if sitting in a court of law, would be satisfied that the finding was in accordance with the evidence or the weight of the evidence and would refuse to disturb the verdict : " Wainwright's Appeal, 89 Pa. 223. This was following Cauffman v. Long, 82 Pa. 72, which is recognized and followed in a multitude of subsequent cases, among which may be cited Combs' & Hankinson's Appeal, 105 Pa. 156, Wilson v. Mitchell, 101 Pa. 495, Appeal of Knauss, 114 Pa. 10, Herster v. Herster, 116 Pa. 612, and Miller's Appeal, supra. We are thus led to the inquiry in the case before us, is there a substantial dispute or conflict of testimony as to the mental condition of testatrix at the date of the execution of the codicil to her will. If so, the contestants are entitled to the issue. At the same time, however, if the testimony be conflicting and contradictory, upon matters immaterial and easily reconciled and explained from other parts of the testimony, and upon a careful consideration of the entire evidence we are satisfied that a verdict against the validity of the codicil is unwarranted by the evidence or the weight of the evidence, our duty is to refuse the issue.

After a more careful consideration of the question presented and fuller consideration of the testimony than we were able to give at the close of the hearing upon the appeal, we have reached the conclusion that sufficient has not been shown by the contestants to entitle them to the issue. The first ground alleged is that testatrix was not of sound and disposing mind at the date of the execution of the codicil, and, therefore, men-

tally incapable of a testamentary disposition of her estate.    No
better definition of what constitutes testamentary capacity can
be given than that by TRUNKEY, J., in Wilson v. Mitchell, 101
Pa. 495, citing Daniel v. Daniel, 39 Pa. 191 ; Tawney v. Long,
76 Pa. 106 ; Leech v. Leech, 21 Pa. 67 : " The question is not
so much what was the degree of memory possessed by the tes-
tator as this : Had he a disposing memory ?   Was he capable
of recollecting the property he was about to bequeath ; the man-
ner of distributing it and the objects of his bounty ?   To sum
up the whole in the most simple and intelligent form—Were
his mind and memory sufficiently sound to enable him to know
and to understand the business in which he was engaged at the
time when he executed the will ? "   And further : " Neither age
and sickness nor extreme distress or debility of body will affect
the capacity to make a will if sufficient intelligence remain."
The failure of memory is not sufficient to create the incapacity
unless it be total or extend to his immediate family or property.
The want of recollection of names is one of the earliest symp-
toms of the decay of the memory ; but this failure may exist to
a very great degree, and yet " the solid power of the under-
standing remain ; " also referring to Van Alst v. Hunter, 5
Johns. Ch. 148.   Keeping this in view, a careful analysis of the
testimony develops these facts :

On December 29, 1894, the testatrix, who was seventy-nine
years old, and had never married, executed a will whereby she
bequeathed all her estate to her brother, William Yorke, abso-
lutely, and appointed him one of her executors.   He was about
five years her senior.   No objection was made as to the validity
of the will, and the entire testamentary capacity of testatrix at
that date was conceded.   She resided with her brother, who
had married in early life, but was at that date a widower with-
out surviving issue.   They, with their servants, composed the
household.   The testatrix managed the domestic affairs of the
family ; she provided for the table, engaged and dismissed ser-
vants, and naturally exercised a general supervision of all that
concerned the welfare of herself and brother.   She was pos-
sessed in her own right of personal estate to a considerable
amount, the care and management of which she committed en-
tirely to her brother.   He was possessed of a much larger estate.
He lived a life of leisure and retirement from active business,

but still occupied himself with careful oversight and management of his own and his sister's fortune.   He enjoyed the pleasures of his home, was fond of the society of his friends and relatives and visits to the club and library to which he belonged. Both he and his sister were of refined tastes and fond of literature and music.   On the same day that testatrix executed her will her brother also made his will, devising and bequeathing to her all his estate absolutely.   Thus the brother and sister evidenced their intention that the survivor should be the possessor of both estates.   Testatrix was in the enjoyment of good health and a vivacious temperament.   She was in the habit of visiting her friends and relatives, and receiving their visits in return.   She would go out alone at her pleasure, and upon errands of business.   Her memory was good.   She was fond of pleasantry and lively conversation.   She was accustomed to read to her brother and converse with friends and visitors about current events.   She would also converse with her brother in French.   She was a musician, and frequently accompanied her brother upon the piano.   They both corresponded by letter with their nieces, the contestants, also with their nephew and his daughters, and also with the husband of her niece, the executor named in the codicil, as shown by notes preserved, until as late as February, 1893, and the penmanship is remarkably distinct and clearly defined.   During every year succeeding the date of execution of her will, and until her death, testatrix and her brother were accustomed to leave their city home and pass the summer months at some popular seaside or suburban resort. At first they were without the companionship of any of their relatives, but, as the infirmities of age increased, they sought the attention and society of their only niece residing in the city, who, with her husband and family, became fellow-boarders with them at the same resorts.   Testatrix was a person of unusual mental activity, in full possession of all her faculties, erect in figure, alert in movement, and in every respect, save the single noticeable exception of impaired vision, was remarkably well preserved for one who had reached the advanced age of eighty-six years.   As before stated, the will executed in 1884 is not the subject of controversy.   So that we now approach a consideration of the facts immediately connected with the preparation and execution of the codicil.   The will of 1884 was drafted

and engrossed by the husband of a niece of testatrix, with whom she and her brother were most intimately associated, and their mutual relations most kind and affectionate.  The draftsman of the will is a reputable and highly respected member of the bar; the son of an intimate friend of testatrix and her brother, and had become the husband of their niece with their full consent and approbation.  He had been the attorney and professional adviser of the brother for more than a quarter of a century.  The wills he had prepared remained unaltered during seven years, and from his testimony we obtained the salient facts and circumstances relating to the codicils.  It does not appear that testatrix ever expressed to the draftsman of her codicil her intention to alter the will she executed in 1884, but from the intimate relation of the parties, we think it was undoubtedly known to them from the statements previously made by testatrix to her niece, his wife.  The result, however, was, testatrix and her brother determined each to execute a codicil.  They did not consult their nephew by marriage, who had, since the execution of their wills in 1884, continued to be their confidential adviser and business manager, but, having settled upon the plan of the disposition of their estate, they summoned him to call upon them at their residence.  This was early December, 1891.  He accordingly complied with their request, and found both testatrix and her brother awaiting his visit.  They each informed him of their wish, and, having, at the time, a memorandum made by them of the amount of their respective estates, dictated to him the disposition they intended each to make of their property.  From the memoranda made by him at that time, the codicil to the will of testatrix was prepared by her friend and adviser, and, together with the codicil to be executed by her brother, was left with her at her residence, for examination.  By advice of counsel, who was consulted by the draftsman of the codicils, the formalities attendant upon the signing and execution of the testamentary papers were committed wholly to the attending physician of the aged testators.  He, accompanied by another well-known physician, a stranger to both testators, met by appointment at their residence.  Testatrix and her brother produced the codicils which had been left with them, and, during an interview lasting at least one hour, in which a general and friendly conversation ensued between the

testators and the physicians, the codicil to the will of testatrix, as well as that to the will of her brother, was read to her by one of the physicians, and, after replying to appropriate inquiries from him that she fully understood its provisions and it expressed her intention respecting the disposition of her estate, she executed the codicil in the presence of her brother and the physicians, the latter becoming subscribing witnesses.    Testatrix was then eighty-six years old, and, according to the testimony of both physicians, in the enjoyment of excellent physical health and clear and intelligent comprehension of the act she was about to perform.    And, although her sight was impaired, her signature to the codicil is distinct and vigorous, and a specimen of chirography which cannot fail to produce favorable comment.    The draftsman of the codicil was not present at its execution, nor in the residence of testatrix and her brother at the time, and did not receive the codicil again into his possession until a day or two subsequent to its execution, when, by the instructions of the brother of testatrix, he deposited it for safe keeping in a box in the trust company.    By the codicil which she thus executed, testatrix bequeathed all her estate to her brother during his natural life ; and, after his death, the following legacies, namely :  To her niece, Ellen Blanchot, who resided in Paris, France, $5,000 ; to her niece, Mary Kingsley, who resided in the state of New York, $5,000 ; to the draftsman of her codicil, whom she also appointed executor, $5,000, in trust for his minor son; to a nephew, $15,000 ; and to her niece, wife of her confidential friend and adviser, $20,000, together with all the rest and residue of her estate.    As the personal estate amounted to $88,000, and the pecuniary legacies to $30,000, the residue will be in the neighborhood of $50,000. Testatrix lived more than two years after the execution of the codicil, and died February 12, 1894.    Her brother survived her, until April 26, 1895, when he died, almost ninety-five years old.

The present contest is by the two nieces of testatrix, one of whom resided in France, and has not seen her aunt for thirty-five years, although it should be stated, they were most friendly and affectionate, as shown by their correspondence, exchange of gifts and pecuniary advances by testatrix's brother; while the other niece had not seen her aunt for about ten years, and ceased correspondence with her for seven or eight years.    There

is practically no conflict of testimony as to the testamentary capacity of testatrix at the date of the execution of the codicil nor at any other time. It is proved most satisfactorily by the subscribing witnesses, both of whom are physicians of high repute, by relatives and connections, by the body servant or valet, who was in attendance upon her brother and a member of the household, by the correspondence she maintained, and by her whole course of conduct until her death. The contestants, one of whom was examined as a witness, did not attempt to contradict this by producing a single individual whose testimony would raise a doubt as to the possession by testatrix of full and complete testamentary capacity. Not a neighbor nor visitor nor fellow guest at any of the summer resorts visited by testatrix and her brother during many years prior to, at the time of, and subsequent to the date of the codicil could be found to support the theory of the contestants. This seemed to be constructed wholly upon alleged declarations by the executor and confidential adviser to one of the contestants in the summer of 1890, while upon a visit to France, that testatrix and her brother, her uncle and aunt, were then both in the greatest decrepitude, bent down by extreme old age, blind and having lost all memory. While the executor testified that he had no recollection of having made any such statements and could not have done so, because it would not be true, for testatrix and her brother were not in any such physical and mental condition, and he is corroborated by every witness examined, yet declarations by the executor or any other legatee as to the mental capacity of the testatrix are clearly inadmissible. And for the reason, that the rights of other legatees cannot be affected or destroyed by declarations and statements not under oath, nor in their presence and without any opportunity to deny or refute: Irwin et ux. v. West et al., 81* Pa. 157, directly in point. As such testimony then is valueless and to be disregarded, we have before us the case of a will of a testatrix, whose testamentary capacity is unimpeached and fully sustained. It is needless, therefore, to say that an issue to determine this question should not be granted. But we have the further ground of objection, namely, that the execution of the codicil was obtained by undue influence exerted by the executor, himself a legatee in trust, and his wife, the principal lega-

tee.  As already remarked, the testimony irresistibly points to the conclusion that the testatrix was fully competent to make her will, possessed with knowledge of the amount of her estate, and intelligently comprehended the objects of her bounty, and the disposition she intended to make of her estate.  Not only presently to her brother for life, should she predecease him, but ultimately at his death, among her nephew, nieces and grandnephew.

Such being the case, her right to dispose of her estate as she deemed proper should be maintained, unless there be proof of some improper influence exercised at the time of the execution of the codicil, whereby her will and intention were so controlled that she was unable to dispose of her property according to her own volition, and thus led to bequeath the bulk of her estate to one niece and her minor son, in preference to her other nieces and nephew.  We have not the instance, which frequently occurs, of a disappointed legatee wholly omitted, but each niece is a legatee for an amount not to be despised nor rejected.  As said by PAXSON, J., in Cauffman v. Long, 82 Pa. 72, " A man's will, the most solemn instrument he can execute, shall not be set aside without any sufficient evidence to impeach it."  The codicil, therefore, must stand, unless there be proof of undue influence in its preparation and procurement.  The entire testimony fails to disclose the slightest proof of any inducement, persuasion or other influence upon the mind of testatrix.  No request or solicitation is shown to have been used by any person whatever; by neither the executor nor his wife, nor any of the legatees named in the codicil which led testatrix to determine upon its preparation and final execution.  And after the most careful consideration no other conclusion can be arrived at than that it was the result of the mutual deliberation, thought and decision of both testatrix and her brother, that the disposition each should make of their property by a simultaneous execution of the codicils to the will of 1884 was the best distribution among those nearest in kin they could adopt, and was in accordance with their respective opinions and preferences.  But the codicil was prepared by the confidential adviser of testatrix, and the bulk of the estate is bequeathed to his wife and family.  As a general rule the burden of proving undue influence is upon those who urge it: Eckert v. Flowry, 43 Pa. 46 ; Hardy's

Estate, 12 Phila. 22 ; Stokes v. Miller, 10 W. N. 241, and numerous other cases upon the same point.   But, where a will is made in favor of one occupying a fiduciary relation to the testator, the burden of disproving undue influence is upon the beneficiary, whether the will was drawn by him or by counsel at his procurement: Rea's Estate, 11 W. N. 77 ; Stokes v. Miller, supra ; Dean v. Negley, 41 Pa. 312.   And as shown in Redfield on Wills, *515, " Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation.   Thus, when a will was written by an attorney or solicitor, who is to be benefited by its provisions, it was considered that this circumstance should excite stricter scrutiny and require clearer proof of capacity, and the free exercise of voluntary choice."   " He must go further and rebut the presumption by some evidence that the disposition made was the exercise of the free will of the testator :" Boyd v. Boyd, 66 Pa. 283 ; especially where, as in that case, the testator was upwards of seventy years of age, infirm of body, not of strong mind, exceedingly illiterate, able to write his name, perhaps to read, but not much more ; during the latter years of his life showing indications of folly and eccentricity, and the scrivener who drew the will and members of his family were largely the recipients of his estate.   Such facts necessarily cast upon the proponent, " the onus of showing that the provisions of the will were fully explained to and understood by the testator and fully assented to by him."   And this "necessarily made it a question for the jury."   Again, in Wilson's Appeal, 99 Pa. 550, where the testator was weak and in extreme old age, and the principal beneficiary was the confidential adviser of the testator, the burden was upon him to prove affirmatively all the circumstances connected with the drawing of the will, and it was held a proper case for an issue.   In both instances the gift was to a stranger to the blood of the testator.   So in Cuthbertson's Appeal, 97 Pa. 163, where the gift was to a stranger, the confidential adviser of the testator of the residue of the estate amounting to some $300,000, and the testator was weak in mind and bodily infirm by reason of attacks of disease, sorrow and mental depression, etc., but not to the extent of mental incapacity, it was held, there must be affirmative proof

of the absence of undue influence, and that testator was fully informed and under no misapprehension as to the value of the residue so bequeathed, and under such circumstances an issue should be awarded. See also Yardley v. Cuthbertson, 108 Pa. 395, where the same principle is again adverted to with emphasis. And in the late case of Armor's Appeal, 154 Pa. 517, it was held that an issue should be granted to determine the question of undue influence, where it appeared that the testatrix was over ninety years old, of feeble mind, and at the suggestion and advice of her son-in-law, who had been her attorney in fact for a number of years and managed her affairs, executed a will appointing him executor, whereby the share of his wife was given to her absolutely, while the shares of all the other heirs were to be held by him as trustee during their lifetime. But the fact that by an officious will, the testator's confidential adviser who wrote the will is made one of the executors, although not a legatee, is not sufficient, upon his offering the will for probate several years after the death of testator, to require him to prove testamentary capacity and absence of undue influence: Linton's Appeal, 104 Pa. 228. From a review of the cases cited and others which might be referred to, it will be observed that the rule that the burden of proof is upon the confidential adviser who prepared the will under which he or members of his family take the bulk of the estate or substantial benefits, to the exclusion of children or next of kin to the testator, is applied where the testimony is conflicting as to the mental capacity of the testator, either from the effects of old age, disease, mental impairment or intemperate habits, and the confidential adviser is a stranger to the testator, or a near relative who has acted in the procurement of the will in his or her favor to the exclusion of others equally entitled, is shown to have exercised a controlling influence over the mind of the testator. But not so, when the testator is proved to possess full and entire testamentary capacity, even, though, to some extent, enfeebled by the infirmities of age. In such case, even although the will be prepared by the confidential friend and adviser, and he or members of his family are bequeathed the whole or larger part of the estate, and he be made executor, the presumption of the validity of the will and disposition made by the testator is in accordance with his voluntary and uncontrolled wish and desire still

exists, and the burden of proof is upon those who assert it was procured by fraud, undue solicitation, importunity or other improper influence. As said in Cuthbertson's Appeal, 97 Pa. 171, " the general rule undoubtedly is that testamentary capacity and knowledge of disposition made are presumed. Where the testamentary capacity is perfect, fraud or undue influence must be shown. In such case the undue influence must be such as to destroy the freedom of will of the party, or at least very much to impair it."

In the present instance, as before stated, the full and complete testamentary capacity of testatrix is most conclusively shown. Not a scintilla was produced to the contrary. The gravamen is undue influence. But the contestants failed to produce the slightest evidence tending to show that any such means to produce the execution of the codicil had been exerted by the executor or his wife or any person whatever. No influence, open or covert, was employed or exercised upon her mind to induce her to dispose of her estate in their favor or for the benefit of any other person. In answer to the imputation that the executor, by reason of his position and relationship and having been the intimate friend and social visitor of testatrix during nearly all his life, and having had charge of her property, with that of her brother, during a number of years prior to her death, took advantage of the confidence and trust imposed upon him, and thereby induced her to bequeath to his wife and son the greater part of her estate, the executor frankly and fully related the history of his acquaintance with testatrix, his relations with her and her brother, and all the facts and circumstances connected with the preparation by him, both of the will, executed in 1884, and the codicil, now the subject of contest. His wife, the principal legatee, was also examined, and with the utmost candor and absence of reserve, testified fully, and with minute detail, upon every subject of inquiry, whether material or irrevelant. They accepted the burden, whether imposed upon them or not, and disclosed to the fullest extent every fact connected with their family history and all the circumstances pertinent to the question before the court. Neither is contradicted, nor the accuracy of their statements discredited. Thus, from the testimony, it is most satisfactorily shown that the executor had no connection with the preparation of the codicil until his services

were required by testatrix; that she gave him instructions for its preparation at her residence, in the presence of her brother, no one else being present; that she was fully informed of the amount of her estate and the value of the residue she was about to bequeath; that she dictated the name of each person whom she intended to benefit after the death of her brother, and the amount of each legacy; that from these instructions the confidential friend of testatrix, who was also the counsel and friend of her brother, made at the time a memorandum from which, at his leisure, he engrossed the codicil. As he also received instructions at the same interview from the brother of testatrix for the preparation of a codicil to his will, after drafting both codicils, the confidential advisor submitted the drafts to a prominent member of the bar, with whom, in his individual practice, he was accustomed to consult, and, as a precaution, was advised by him to take no active part in the execution of the codicils, further than to procure the attendance of the family physician, who should select another physician as witnesses to the execution of the codicil. In pursuance of this advice, the codicils were engrossed by the confidential adviser, and placed by him in the possession of testatrix and her brother for their examination. The next day, or soon thereafter, he informed the family physician that his services were required as a subscribing witness, who, together with another well-known medical expert, visited the testatrix and her brother at their home. Both codicils were read to them, and the physicians, being satisfied with their testamentary capacity and that each intelligently comprehended the contents and provision of the testamentary papers, the codicils were signed by the testators in the presence of the physicians as attesting witnesses. The confidential friend of the testatrix, as has already been stated, was not present at the time of the execution. The testamentary papers were left in the possession of testatrix and her brother, and soon thereafter deposited in the box of a safe deposit company. There they remained until the death of testatrix, which did not occur until more than two years subsequent to the date of the codicil.

In view of these circumstances, no legal fraud nor undue influence can be inferred. It may be said that it was in accord with the every day affairs of life that testatrix should consult with her friend and adviser, the husband of her only niece resid-

ing in this city, and with both of whom she had been, for so many years, upon the most intimate, cordial and affectionate relations, and from his familiarity with her business affairs and with those of her brother, his selection as executor is also most reasonable and proper. Testatrix being unmarried and without descendants may be said to be without "natural objects of her bounty." Her next of kin were all volunteers. And the disposition she made of her property to her brother for life, and after his death to the issue of deceased brothers and sisters, showed that she exercised careful deliberation and discrimination. Her preferences should not be set aside without just cause ; and sufficient reasons appear for this discrimination and preference. Her two nieces, the contestants, were remembered by her, but owing to their long absence and cessation of correspondence were almost strangers. Her minor grandnephew bore her brother's name. Her nephew was a distinguished officer of the United States navy, and the residuary legatee was her favorite niece, who had resided with her twelve years prior to her marriage, and thereafter a constant visitor to the home of her uncle and aunt. She was attentive to their wants and assiduous in providing for their comfort. She was their companion summer after summer, as has already been stated, and this attention and solicitude were continued until the death of both uncle and aunt, and their expressions of appreciation of her kindness and affection were of frequent occurrence. Can it be, therefore, any source of surprise, or afford any suggestion of improper influence, that testatrix should bequeath the greater part of her estate to a niece for whom she entertained so much affection, and prefer her in a greater degree to others of her kindred. It seems to be the most natural impulse so to do.

Without further recital of the facts proved without contradiction, it only remains to say we are fully sustained in the conclusion we reach by the principles applicable to the present case, as laid down by ELWELL, P. J., and approved by the Supreme Court, in Harrison's Appeal, 100 Pa. 458. In that case testator was eighty years of age, but possessed of mental and physical vigor, as testatrix is shown to have possessed. At his request his will was drawn by his son-in-law, who was his counsel and confidential adviser, whereby the bulk of his estate was bequeathed to one daughter, the wife of his confidential adviser.

Upon appeal from the register, it was held, that in the absence of any evidence showing undue influence, or that testator had not full knowledge of his estate and its disposition, no presumption arose against the validity of the will.    And further, that there were no facts which, if submitted to a jury, would justify a verdict against the validity of the will, and therefore a verdict to test such validity was properly refused.    In the course of his able opinion, Judge ELWELL quotes from Wilson v. Moran, 3 Bradford (N. Y.), 172, where the court said: "No case has gone so far as to overthrow a will duly executed, when it was shown that the party executing was of sound mind and understood its contents, though it was drawn by the person taking the estate."    And also what is said by this court in In re Codicil of John L. Neill, deceased, 37 Leg. Int. 39 : "In brief, there is ample evidence in this case of entire testamentary capacity, no proof whatever of undue influence, either by the executor or his wife, the principal legatee, and there being no conflict of testimony or sufficient evidence to justify a verdict against the validity of the codicil, the exception to the award of the issue is sustained, and the demand for an issue is refused."

*Error assigned* was the decree of the court.

*George Gluyas Mercer* and *Talcott H. Russell*, for appellants, cited Baker v. Batt, 2 Moore's Privy Council, 317; Moore v. Spier, 80 Ala. 133; Garvin's Adm'r v. Williams, 44 Mo. 465; Meek v. Perry, 36 Miss. 190; Shipman v. Furniss, 69 Ala. 555; Waddell v. Lanier, 62 Ala. 347; Douglas's Estate, 162 Pa. 568; Miller's Est., 179 Pa. 645 ; Ins. Co. v. Weide, 11 Wall. 438; Yardley v. Cuthbertson, 108 Pa. 395 ; Caldwell v. Anderson, 104 Pa. 199; Armor's Est., 154 Pa. 517 ; Fulton v. Andrew, L. R. 7 Eng. & Ir. App. Cases.

*John G. Johnson* and *John Hampton Barnes*, for appellee, cited Harrison's App., 100 Pa. 458 ; Wilson v. Mitchell, 101 Pa. 495; Herster v. Herster, 116 Pa. 612; Harvey's Estate, 181 Pa. 213; Eckert v. Flowry, 43 Pa. 46 ; Tawney v. Long, 76 Pa. 106 ; Trost v. Dingler, 118 Pa. 259.

PER CURIAM, March 21, 1898 :

A careful consideration of the voluminous record in this case

has led us all to the conclusion that the orphans' court in banc was clearly right in sustaining the exception to the order awarding an issue devisavit vel non, etc., and refusing to grant said issue. It is not our purpose to fortify this conclusion by referring to the testimony or stating the reasons which have satisfied us that neither of the specifications of error should be sustained. To do so, would consume much time to no good purpose.

Decree affirmed and appeal dismissed at appellants' costs.