# Gongaware, et al., *v.* Donehoo, et al.

*Wills—Fraud—Undue influence—Testamentary capacity—Confidential relation—Interlineation.*

1. The influence exercised in procuring the execution of a will, and relied on to set it aside, must be such as destroys the free agency of the testator and subjects his mind to the will of another person. It must be a present restraint operating as a moral coercion at the time the will is made. There must be present the power and will of another which so controls the mind of testator that he is unable to decide for himself, but submits to the desire of the former.

2. Where in proceedings to contest the validity of a will, attacked on the ground that testatrix lacked testamentary capacity, and that fraud and undue influence were exercised over her by one of her beneficiaries, it appeared that although testatrix occasionally suffered from hallucinations and was rambling in her conversation and changed from one subject to another, yet where it further appeared that testatrix attended to her business affairs in a way that indicated that she had a proper conception of business matters and terms, and that she had transacted business with various witnesses who testified that she was mentally sound and knew what she was doing, the evidence of testamentary incapacity was insufficient to sustain a verdict against the will.

3. While it is true that where a testator leaves a substantial part of his estate to one occupying a confidential relation, the burden is on the latter to show that no improper influence controlled the making of the will, this presumption arises only where there has been proof of extreme infirmity or mental weakness and the physical and mental condition of testatrix must be shown to be of such character in order to raise this presumption.

4. Where it appeared that testatrix's pastor was executor and legatee and that a certain church and hospital in which he was interested were beneficiaries under the will, which had been given into his possession for safe keeping by testatrix, but that while such pastor frequently called upon testatrix to discuss her business affairs with her, as well as religious and charitable subjects, yet that the scheme of distribution had been agreed upon between testatrix and her husband, who had predeceased testatrix, there was no such imprisonment of body or mind, fraud, threats, misrepresentations, inordinate flattery, or physical or moral coercion as to destroy the free agency of testatrix and operate as a present re-

straint upon her in making the will and a verdict against the will attacked on the ground of undue influence could not be sustained.

5. Where there were interlineations in the will, but one of the subscribing witnesses testified that such interlineations appeared in the will when it was submitted for attestation, and the other was dead, the testimony fully established the will in the form presented and met the burden cast upon proponents to account for the interlineation.

6. Where it appeared that the will might have been written fifty-six days prior to its execution, the opinion of a handwriting expert to the effect that the interlineations were written from sixty to ninety days after the main body of the will, based upon an examination made about five years subsequent to the date of the writing, was insufficient to warrant the submission to the jury of the question whether the interlineations were made after the date of the execution of the will.

Argued Oct. 3, 1916.    Appeals, Nos. 26, 27, 28, Oct. T., 1916, by Passavant Hospital, T. R. Pittock and George J. Gongaware, Executors, and First English Evangelical Lutheran Church in Pittsburgh, from judgment of C. P. Beaver Co., June T., 1914, No. 83, on verdict for defendants, in case of Rev. George J. Gongaware, Thomas Eaton, First English Evangelical Lutheran Church in Pittsburgh, Passavant Hospital, T. R. Pittock and Rev. George J. Gongaware, Executors of Mary E. Miller, Deceased, v. Pearl A. Donehoo, Sarah M. King, Mary E. Thomas, Margaret E. Smith, E. M. Dickson, Harry H. Dickson and Algernon B. Dickson.    Before MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ.    Reversed.

Feigned issue to determine the validity of a will.    Before HOLT, P. J.

The opinion of the Supreme Court states the facts.

Verdict for defendants and judgment thereon.    Plaintiffs appealed.

*Errors assigned* were answers to points and instructions to the jury.

*J. Boyd Duff,* with him *John H. Mueller, Leander Trautman* and *Frank E. Reader,* for appellants.

*Samuel L. Dille,* with him *F. G. Moorhead,* for appellees.

OPINION BY MR. JUSTICE FRAZER, January 8, 1917:

Mary E. Miller died January 31, 1912, leaving a will, dated September 22, 1908, written in her own handwriting, in which, after giving certain specific legacies to relatives and friends, including her pastor, Rev. George J. Gongaware, she divided the remainder of her estate in three parts, and gave one-third to her cousin Thomas Eaton, one-third to the Evangelical Lutheran Church of Pittsburgh, and one-third to the Passavant Hospital, and appointed T. R. Pittock and Rev. Mr. Gongaware executors. Her husband died July 29, 1908, in the Passavant Hospital, having made a will in which he left all his property to his wife. They had no children and the nearest relatives of Mrs. Miller were nieces and nephews. A cousin, Thomas Eaton, who was mentally defective, resided with her until her death. The nieces and nephews are contesting the will. An inspection of the instrument shows an interlineation after the gift of one-third of the residuary estate to Thomas Eaton, which provides "at his death to be divided among other beneficiaries." There are also several other interlineations, as, for example, in the gift to the First Evangelical Lutheran Church, the abbreviation "Eng." is inserted between the words "First" and "Evangelical," and the word "this" is inserted in the clause appointing executors. The contestants contend testatrix was mentally incompetent at the time the will was made, and that it was procured by undue influence on the part of Rev. Mr. Gongaware. An issue was awarded in which contestants were made defendants, and the Passavant Hospital, the First English Evangelical Lutheran Church and the executors of the will plaintiffs. The jury found

in favor of defendants.    This verdict, however, was set aside and a second trial also resulted in a verdict against the will.    Motions for a new trial and for judgment non obstante veredicto were overruled and from the judgment entered on the verdict we have this appeal.

In the issue framed in the court below, the first question for consideration was whether testatrix was mentally competent to make a will.    She was about seventy-four years of age at the time of her husband's death. After his death she resided with her defective cousin on a farm which her husband owned, and had little intercourse with her other relatives.    There is evidence that she had for some time shown signs of mental and physical weakness which increased after her husband's death. This evidence consists chiefly of testimony that her actions were peculiar, and that she was nervous and forgetful and unsettled in her mind, extremely talkative along certain lines, but rambling in her conversation and changing frequently from one subject to another.    At times she stated her belief that her deceased husband was near her and in other ways indicated that she was superstitious and imaginative.    All this evidence, however, especially in view of her age, falls short of proving she was mentally incompetent to dispose of her property by will.    While one witness to the will testified he had no clear recollection of testatrix except that she was an elderly woman, the other testified she was apparently in possession of her full mental faculties.    This testimony as to her mental condition was corroborated by numerous witnesses who had business dealings with her before and after the date of the will.    She attended to her business affairs in a way that indicated a proper conception of business matters and terms, especially in one who was uneducated and without business experience.    Various witnesses with whom she transacted business, or whom she consulted at times with reference to her property, testified she appeared mentally sound and knew what she was doing.    She prepared her will in her own hand-

writing and took it to the office of a notary public and requested that it be "recorded." Upon being told that it could not be "recorded" until after her death, and also that it should be dated and witnessed, she at once inserted the date and asked that it be signed by two witnesses, which was done in her presence, she having signed the paper before bringing it to the notary's office. She took the will away with her and it remained in her possession until several years later, when she turned it over to Rev. Mr. Gongaware, her pastor, together with other papers, requesting him to keep them for her. The court below recognized the weakness of the evidence to sustain the allegation of unsound mind, and stated that, if this was the only question involved, it would hold the evidence insufficient to sustain a verdict against the will. We agree with this view of the evidence and it remains to be determined whether or not there is sufficient evidence to sustain the verdict that the will was procured by undue influence on the part of her pastor, Rev. George J. Gongaware, who was one of the executors and a legatee under the will.

A careful examination of the voluminous record fails to disclose sufficient evidence of undue influence to warrant submission of the case to the jury. While it appears that Rev. Mr. Gongaware frequently discussed her business affairs with the testatrix, and he, together with the church and hospital, in which he was interested, were the chief beneficiaries under the will which had been given into his possession for safe keeping by testatrix, yet his friendly relations with her are fully explained by him and appear to be only such as might be satisfactorily accounted for by the circumstance of the relation between pastor and an aged parishioner. In view of this explanation, the evidence produced by defendants falls far short of proving that he exercised such influence over testatrix as to destroy her free will in disposing of her property. It is true he called upon her quite often and was apparently highly esteemed by testatrix, but this

was only the natural result of her extreme age, coupled with her great interest in religion and in the charitable work connected with the activities of the beneficiaries. While the numerous letters that passed between them and were offered in evidence contain many passages which indicate her pastor was advising her in business as well as in spiritual matters, his testimony sufficiently explains these statements and presents them in a light different from the construction sought to be placed upon them by defendants. In addition to this, the will appears to be in accordance with an understanding between testatrix and her husband concerning the disposition of their estate. Previous to the date of the will and shortly before her husband's death, they discussed the question of the disposition of their property and agreed it should be distributed in accordance with the provisions subsequently inserted by testatrix in her will. This testimony is uncontradicted, and it further appears the will as written is in substantial accord with the wishes of her husband. She frequently stated she had made her will in accordance with his wishes, and that she intended to remember the hospital and her cousin "Tommy," but that her other relatives would not get anything as they had done nothing for her. Rev. Mr. Gongaware was not present when the will was executed, and, so far as it appears from the evidence, had nothing to do with its execution.

The influence exercised in procuring the execution of a will and relied on to set it aside, must be such as destroys the free agency of the testator and subjects his mind to the will of another person. It must be a present restraint operating as a moral coercion at the time the will is made. There must be present the power and will of another which so controls the mind of testator that he is unable to decide for himself, but submits to the desire of the former: Smith's Est., 250 Pa. '67. Consequently, to constitute undue influence there must be imprisonment of body or mind, fraud, threats, misrepresentations,

inordinate flattery, or physical or moral coercion to such a degree as to prejudice the mind of testator and destroy his free agency and operate as a present restraint upon him in the making of the will: Phillips's Est., 244 Pa. 35. While it is true that, where a testator leaves a substantial part of his estate to one occupying a confidential relation, the burden is on the latter to show that no improper influence controlled the making of the will: Adams's Est., 220 Pa. 531; yet this presumption arises only where there has been proof of extreme infirmity or mental weakness (Phillips's Est., 244 Pa. 35, 44, 46), and the physical and mental condition of testatrix in this case has not been shown to be of such character as to raise this presumption. While it may be testatrix was prejudiced against some of her relatives; so long as she was mentally competent she was entitled to distribute her property as she might see fit without regard to the personal motives or prejudices which influenced her in making the will: Phillips's Est., supra. The testimony of contestants' witnesses, as well as passages in the various letters between testatrix and her pastor, are as consistent with the theory that no improper influence existed as with the theory that it did exist (Phillips's Est., supra, 45; Caughey v. Bridenbaugh, 208 Pa. 414, 423), and when these letters are considered in view of the explanation by Rev. Mr. Gongaware, there remains no adequate reason for permitting the jury to place upon them an improper construction. The letters at most show that testatrix was extremely religious and had a high regard for her pastor, while the interest of the latter in her welfare may properly be accounted for by the circumstance of the relationship between pastor and an aged member of his congregation who resided alone with a weak-minded relative. We have nothing to do with the superstitious, religious beliefs or prejudice of testatrix. In these matters she was entitled to her individual opinion and the fact that her views did not accord with those of contestants and were the occasion of disappointment on

their part is no reason for holding either that testatrix was mentally incompetent to make a will or that improper influence was exercised over her by the beneficiaries therein.

In view of the disposition of the first two questions raised, it becomes necessary to consider the effect of the alterations in the will. The principal contest is with respect to the interlineation disposing of the remainder after the death of Thomas Eaton among the other beneficiaries. The trial judge placed the burden on plaintiffs of showing that the interlineations were in the will at the time of its execution in the presence of witnesses, and said if it appeared from the evidence the interlineations were made by another without the authority of testatrix and after the execution of the will, the interlineations would be void and the balance of the will would stand, providing testatrix was found to be of sound mind and the execution of the will was not procured by undue influence. The court charged further that if the interlineations were made by testatrix, or by another at her request, after the execution of the will, the entire will would fall because of want of proof in its altered form. The jury found the interlineations were made by testatrix subsequent to the execution of the will and that the will was therefore invalid. Is this finding correct?

One of the witnesses to the will having died, his former deposition was offered in evidence. He testified testatrix came into the office and he was asked by another on behalf of Mrs. Miller to witness the paper, that he did not know the nature of the writing and did not examine it before signing, and that he could only recall that he was asked to witness Mrs. Miller's signature. The other witness testified Mrs. Miller came to his office with the will fully written and asked him to have it recorded. He informed her it could not be recorded, but that it should have a date and should be witnessed. Mrs. Miller then wrote in the date and he and Mr. Brown signed as wit-

nesses. He testified Mrs. Miller referred to some inter-
lineations and that the writing was in the same condi-
tion then as it was at the time his testimony was taken,
with the exception of an ink stain on the margin. He
also says he glanced over the will and mentioned the fact
that it contained interlineations and that Mrs. Miller
said she had written all of them herself. The testimony
of these two witnesses fully established the will in the
form presented and met the burden cast on plaintiffs to
account for the alterations. It is immaterial that one
subscribing witness did not know the contents of the
paper or that it was a will, or that neither of them saw
testatrix sign it, so long as she acknowledged her signa-
ture in their presence: Kessler's Est., 221 Pa. 314. If
the interlineations were in the handwriting of testatrix
it will be presumed they were made before the execution
of the will: Morrow's Est. (No. 1), 204 Pa. 479. But if
not in her handwriting the proof of the will by the sub-
scribing witnesses was sufficient to establish it in its
altered form. This is true even as to the deceased wit-
ness, though he did not testify directly on this point.
As to the other witness, we have his positive statement
that the alterations were there at the time the will was
acknowledged and testatrix admitted she made them in
her own handwriting. This effectually establishes the
will as altered and placed on contestants the burden of
showing alterations subsequent to execution. A number
of other witnesses were called on each side with respect
to the interlineations. Expert and nonexpert witnesses
for plaintiffs testified the interlineations were in the
handwriting of testatrix. On the other hand there was
an equal amount of testimony on the part of defendants
to the effect that interlineations were not in the same
handwriting as the body of the will. However, if the
alterations existed before the execution of the will, the
question as to who made them is immaterial since they
were adopted by testatrix. The real point for considera-
tion therefore is whether defendants produced sufficient

evidence to contest the will as established by the subscribing witnesses so as to require the question whether the alterations were made subsequent to the execution of the will to be submitted to the jury.

The only evidence offered by defendants on this point was that of two handwriting experts, one of whom testified that the interlineations were written subsequent to the body of the will, and the other testified they were written at least sixty days after the will itself was written. There is nothing to show just when the will was written. It may have been written in fact at various times and the interlineations may have been added as an after thought on the part of testatrix. But so long as this was done before the paper was finally attested or acknowledged before the subscribing witnesses, the time of making the alterations is immaterial. That testatrix talked over with her husband the question of the disposition of the estate, on July 26, 1908, three days before his death, is undisputed. The will must therefore have been written some time between the date of this conversation and the day on which testatrix brought it to the office of the notary for "recording." There was therefore a period of time not exceeding fifty-six days prior to the execution of the will within which it must have been made. In view of these facts the opinion of the handwriting expert to the effect that the interlineations were written from sixty to ninety days after the main body of the will, based on an examination made about five years subsequent to the date of the writing, is insufficient to overcome the prima facie case made out by plaintiffs and to warrant submission to the jury of the question whether the interlineations were made after the date of the execution of the will.

Judgment reversed and issue directed to be set aside, costs to be paid by appellees.