328 A.2d 480

In re ESTATE of Rocco BUTTON, a/k/a
Rocco Botton, Deceased.

Appeal of Florence LERUM et al.

Supreme Court of Pennsylvania.

Argued Oct. 1, 1973.

Decided Nov. 22, 1974.

Milton D. Rosenberg, W. Bryan Pizzi, II, Bloom, Bloom, Rosenberg & Bloom, Washington, for appellants.

John F. Bell, Washington, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

JONES, Chief Justice.

Rocco Botton died on August 8, 1969, survived by two daughters and a son,—Florence Lerum, Viola Bergmann and Samuel Botton, respectively. Marie Selvoski and Charles Selvoski, Jr., her husband (who were not related

in any manner to deceased), presented for probate to the Register of Wills of Washington County an alleged will purportedly executed by deceased on March 21, 1969, and the Register of Wills accepted this will for probate. Under the provisions of this will, deceased left $1.00 to each of his three children, bequeathed the residue of his estate to the three minor children of the Selvoskis and named Marie Selvoski and Charles Selvoski, Jr. as decedent's personal representatives. On August 16, 1969, deceased's children appealed from the probate of the will to the Orphans' Court Division of the Court of Common Pleas of Washington County. After a hearing at which extensive testimony was taken, the court denied an issue *devisavit vel non*, upheld the validity of the will and entered a decree affirming the probate of the will. From that decree this appeal followed.

The parties to this appeal agree that deceased did execute the will. However, appellants allege that at the time the writing was executed by deceased, his physical and mental condition had been gravely impaired by illness and infirmity, that he lacked testamentary capacity, and that the writing was procured by undue influence, duress and constraint practiced upon the deceased by the Selvoskis, who had physically and mentally held him "captive" from March 1969 until August 8, 1969, the date of his death.

The issues before this Court are whether the evidence before the chancellor sustained the findings that deceased at the time of the writing's execution was of sound mind and capable of disposing of his estate by will and that the writing was not procured by the undue influence of the Selvoskis.[1]

---

1. It must be pointed out the deceased had had a savings account totaling $23,561.05 in the Mellon National Bank and Trust Company in the names of himself and his daughter, Florence Lerum. On April 1, 1969, the day after he had executed the alleged will, the deceased, accompanied by Marie Selvoski, went to the bank, closed out his savings account and transferred the entire balance

Deceased was a widower of many years. His three children were married and resided apart from their father. In his later years, deceased occupied only a portion of his farmhouse and leased the remainder, over the years, to various persons, including Mrs. Selvoski's parents.

Mr. Botton had been hospitalized several times during the two-year period before his death. In late 1968, after one such hospitalization, he took up temporary residence with his son, Samuel. A few weeks later, however, when Samuel's wife became ill, deceased went to live at a friend's home for a short time. Samuel had made arrangements for deceased to enter the Washington Manor Convalescent Home, but the deceased refused to go, believing that he was about to be placed in a county "poor home."

Deceased resided with his friend until February 1969, when he was again hospitalized. After being discharged from the hospital in March 1969, Rocco Botton did not return to either his son's or his friend's home but went to live at the Selvoskis where Mrs. Selvoski looked after him generally. The evidence indicates that the Selvoskis

to a new account entitled "Rocco Botton in trust for Marie M. Selvoski." In a separate proceeding in the Orphans' Court Division of the Court of Common Pleas of Washington County, the title to this bank account was at issue. After a hearing, the court directed that the full amount of the savings account which had been withdrawn by Marie Selvoski after the deceased's death should be returned to the bank and placed in the name of deceased and Florence Lerum. In reaching its determination the court held, *inter alia:*

"The hearing judge unhesitatingly concludes that there existed a confidential relationship between Rocco Botton and Marie M. Selvoski. He was untutored, could not read or write (except to sign his name), spoke broken English with difficulty, was aged, infirm, and in very poor physical condition, had no one to turn to for advice or assistance while living at the home of Marie Selvoski after February 1, 1969."

The court reasoned that Marie Selvoski had not sustained her burden of proof to show donative intent on the part of the deceased. Consequently, the purported transfer of the savings account was invalid. We affirmed that decree in *Botton Estate,* 445 Pa. 609, 284 A.2d 501 (1971).

did everything possible to keep deceased from all contact with other persons. When an occasional visitor of the deceased did arrive at the Selvoski home, either Mr. or Mrs. Selvoski normally remained in the room and, in fact, attempted to limit deceased's conversation.[2]

At least from February 1969 until his death in August 1969, the deceased was physically ill, suffering from arthritis and arteriosclerosis. At the time of his hospitalization in the early part of 1969, decedent's gradual physical deterioration had also affected his mental condition.[3] Deceased, in this weakened physical and mental condition, was released from the hospital on March 3, 1969, into the care of the Selvoskis. Four weeks later, on March 31, 1969, Rocco Botton purportedly revoked his prior will which benefited his natural children, and in its place substituted another will in favor of the children of Marie and Charles Selvoski.

2. On one occasion, when Mrs. Lerum, deceased's daughter, went to the Selvoski home to urge her father to enter Washington Manor, an argument arose in the course of which Marie Selvoski struck Mrs. Lerum and ordered her to leave the house.

3. This physical (and its attendant mental) deterioration is evident from a brief consideration of Rocco Botton's medical history.
   Decedent was first admitted to the hospital in 1967 suffering from an occupational lung disease and bronchial pneumonia, the final diagnosis of his condition being pneumoconiosis, chronic lung disease and pneumonia of the right lower lobe of the lung. When admitted to the hospital in late 1968, deceased had arteriosclerosis, heart disease, congestive heart failure and pulmonary emphysema, symptomized by shortness of breath and dropsy. The records for deceased's hospital stay during July 1968 evidence early indications of mental deterioration. While hospitalized at this time Mr. Botton was occasionally confused, pulled out the intravenous needles several times and attempted to leave his bed so often that he was placed in restraints.
   When admitted to the hospital in February 1969 deceased was again diagnosed as suffering from arteriosclerosis and congestive heart failure. While hospitalized he also suffered a gall bladder attack. During this stay, according to the testimony of Dr. John J. Bonessi and the hospital records, deceased was again disoriented at times. Dr. Bonessi testified that he was sure deceased "had periods when he had episodes which are characterized as chronic brain syndrome," that there were times when deceased was incompetent and that, when in a state of confusion, he had an impairment of judgment.

■ At the outset, we recognize, with the appellees, that "the findings of an Orphans' Court judge, who heard the testimony without a jury, are entitled to the weight of a jury's verdict and are controlling upon us . . .." *Masciantonio Will*, 392 Pa. 362, 367, 141 A.2d 362, 365 (1958). Such findings should stand unless the chancellor has committed either an abuse of discretion or an error of law which controlled the outcome of the case. *Protyniak Will*, 427 Pa. 524, 532, 235 A.2d 372, 377 (1967); *Dettra Will*, 415 Pa. 197, 201, 202 A.2d 827, 830 (1964); *Williams v. McCarroll*, 374 Pa. 281, 299, 97 A.2d 14, 22 (1953).

■ In his opinion accompanying the denial of appellants' petition for an issue *d.v.n.*, Judge Marino stated:

"Where a gift is made by will to one standing in a confidential relation,[4] the burden of disproving undue influence is not placed upon the beneficiary named in the will. . . ."

This statement of the law is correct and stands as a corollary to the basic rule that undue influence must be demonstrated by the party alleging it. *See, e. g., Protyniak Estate*, 427 Pa. 524, 235 A.2d 372 (1967), and *Higbee Will*, 365 Pa. 381, 75 A.2d 599 (1950). A confidential relationship, *in itself*, is insufficient to shift the burden of proof of undue influence.[5] likewise, debility of mind

---

**4.** Confidential relationship has been defined by our Court as the relationship which exists whenever "the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed [for] in both [situations] an unfair advantage is possible." *Leedom v. Palmer*, 274 Pa. 22, 25, 117 A. 410, 411 (1922), *quoted in McClatchy Estate*, 433 Pa. 232, 237, 249 A.2d 320, 322 (1969); *Carson Estate*, 431 Pa. 311, 317, 245 A.2d 859, 862 (1968); *Thompson Will*, 387 Pa. 82, 88, 126 A.2d 740, 744 (1956); *Williams v. McCarroll*, 374 Pa. 281, 294, 97 A.2d 14, 20 (1953); *Hamberg v. Barsky*, 355 Pa. 462, 465–466, 50 A.2d 345, 346 (1947).

**5.** *See Koons's Estate*, 293 Pa. 465, 469, 143 A. 125, 126 (1928): "[Where] there was no proof of extreme infirmity or mental

and body not amounting to testamentary incapacity, *in itself*, does not shift the burden. *Brantlinger Will*, 418 Pa. 236, 248 n. 20, 250, 210 A.2d 246, 253 n. 20, 254 (1965); *Kerr v. O'Donovan*, 389 Pa. 614, 627, 134 A.2d 213, 218 (1957). However, we have consistently maintained that where "a person in a confidential relationship receives the bulk of the . . . testator's property [and the] testator was of weakened intellect, the burden is upon the person occupying the confidential relation to prove that the . . . bequest was the free, voluntary and clearly understood act of the other party and that the entire transaction . . . was unaffected by undue influence or imposition or deception or fraud." *Williams v. McCarroll*, 374 Pa. at 295, 97 A.2d at 21.[6]

■ The chancellor rightly concluded that a confidential relationship existed between the deceased and the Selvoskis, whose three minor children would receive under the contested will practically the entire probate estate. Both the appellants and appellees testified to the extremely weakened physical condition of the deceased, and the appellants presented expert and lay opinions of the deceased's weakened intellect. These factors taken together shifted the burden of proof to the appellees, and the chancellor erred when he placed that burden on the appellants.

■■ Once the burden shifted, it was incumbent on the appellees to demonstrate the absence of undue influ-

weakness, the confidential relation did not change the burden of proof." *See also Buechley's Estate*, 278 Pa. 227, 229, 122 A. 287, (1923); *Gongaware v. Donehoo*, 255 Pa. 502, 508, 100 A. 264, 266 (1917).

6. *See also Jervis Will*, 443 Pa. 226, 231, 279 A.2d 151, 154 (1971); *Brantlinger Will*, 418 Pa. 236, 250, 210 A.2d 246, 254 (1965); *Ash Will*, 351 Pa. 317, 322, 41 A.2d 620, 622 (1945); *Pusey's Estate*, 321 Pa. 248, 268, 184 A. 844, 853 (1936), quoting *Mary Yorke's Estate*, 185 Pa. 61, 69, 39 A. 1119 (1898); *Dible's Estate*, 316 Pa. 553, 555, 175 A. 538, 539 (1934). It is clear from these cases that the "weakened intellect" of the deceased need not amount to testamentary incapacity.

ence by clear and convincing evidence.[7] *Girsh Trust,* 410 Pa. 455, 471, 189 A.2d 852, 859 (1963). Here, the appellees' evidence, when contraposed with that presented by the appellants, fell far short of the character and degree necessary to sustain their burden. Other than their own testimony, the appellees only offered, on the issue of undue influence, the testimony of three persons— two neighbors and a workman. They testified that the deceased had, on occasions, spoken to others out of the presence of the Selvoskis. This evidence was offered to rebut the appellants' position that the Selvoskis never allowed the deceased to speak to visitors alone. Such evidence failed to satisfy the appellees' burden of establishing the lack of undue influence.[8]

Decree reversed. Costs to be paid by appellees.

---

7. "[A] claim against a decedent's estate can be established and proved only by evidence which is clear, direct, precise and convincing." *Petro v. Secary Estate,* 403 Pa. 540, 543, 170 A.2d 325, 327 (1961). This burden requires proof greater than a mere preponderance, *Girsh Trust,* 410 Pa. at 471, 189 A.2d at 859, but less than beyond a reasonable doubt. *Petro v. Secary Estate,* 403 Pa. at 543, 170 A.2d at 327.

8. In view of the appellees' failure to demonstrate the absence of undue influence, it is unnecessary to resolve the issue of the presence of testamentary capacity.