J-A11014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF CLARA FLATOW, DECEASED, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| | |
| APPEAL OF: SAMANTHA WESTON | |
| | No. 1248 EDA 2015 |

Appeal from the Order Entered March 25, 2015
In the Court of Common Pleas of Delaware County
Orphans' Court at No(s): No. 677 of 2011; No. 2312-2900

BEFORE:  SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED JULY 15, 2016**

Samantha Weston ("Niece") appeals from the March 25, 2015 order denying her exceptions in this will contest, thereby making final the orphans' court's February 10, 2015 order denying her motion for summary judgment and granting summary judgment in favor of The New York Public Library; Astor, Lenox, and Tilden Foundations; The Sierra Club Foundation; The Salvation Army of New York City; The Pennsylvania SPCA; and Surrey Services for Seniors (collectively "The Charities").[1]  We affirm.

---

[*]  Former Justice specially assigned to the Superior Court.

[1]  Attorney John Potts ("Attorney Potts") and the Pittsburgh Office of the Attorney General ("the Commonwealth") joined The Charities' motion.  The Commonwealth participated in this matter as *parens patriae*.  **See** Commonwealth's Brief at 20 (citing Commonwealth Attorneys Act, 71 P.S.
*(Footnote Continued Next Page)*

Clara Flatow ("Decedent") was a childless widow who lived most of her life in New York and her final years as a resident of Dunwoody Village in Newton Square, Pennsylvania. She died in 2012 at the age of 99 with an estate valued at $5.1 million. Prior to the circumstances underlying this matter, Decedent executed seven wills. Pepper Hamilton LLP prepared the first three wills, and Attorney Potts prepared the last four wills, which Decedent executed in May of 2004, December of 2005, December of 2007, and June of 2011 ("June 2011 Will"). In each of the four wills, Attorney Potts was named executor with no benefit and no discretion regarding how to distribute the estate. Niece was a named beneficiary, but the residuary clause distributed the vast majority of Decedent's estate to various charities.

Niece is the daughter of one of Decedent's two brothers. Although Niece lived in Colorado before and during these proceedings, she re-entered Decedent's life in 2006—shortly after Decedent's sister died in 2005—with occasional visits and copious phone calls. At Niece's urging, Decedent gave Niece a durable power of attorney in August of 2010. In July of 2011, Niece informed Attorney Potts that Decedent wanted to change her June 2011 Will. Upon reviewing the proposed changes, Attorney Potts explained that he

*(Footnote Continued)* ————————

§ 732-204(c) ("[P]ursuant to the Commonwealth Attorneys Act, the Attorney General is authorized to intervene in any action 'involving charitable bequests and trusts.'")).

would need to meet with Decedent independently before modifying the June 2011 Will. In response, Niece contacted Attorney Edward Glickman, who, after meeting with Niece and Decedent together and Decedent individually, prepared a new will for Decedent. On August 18, 2011, Decedent executed the new will ("August 2011 Will"), which distributed the majority of Decedent's estate into a trust for Niece and named Niece's husband as executor and trustee with absolute discretion to make distributions of the trust principle to Niece and her heirs.

When Attorney Potts learned of the August 2011 Will *via* a letter from Attorney Glickman, he consulted three independent legal experts[2] about his concern that Decedent had been financially exploited.[3] Based on those

---

[2] Attorney Potts first consulted with Bradley Rainer, Director of the Pennsylvania Bar Institute, co-chair of the Professional Responsibility Committee of the Pennsylvania Bar, and co-chair of the Professional Guidance Committee of the Philadelphia Bar Association. Next, Attorney Potts consulted with Mary Kenney of the Pennsylvania Attorney General's Office. Lastly, Attorney Potts consulted with Joe Lastowka, Esquire, an estate planning attorney. Orphans' Court Opinion, 2/6/15, at 8–9.

[3] Under the Older Adults Protective Services Act, 35 P.S. § 10225.101– 10225.5102, "exploitation" is defined as follows:

> An act or course of conduct by a caretaker or other person against an older adult or an older adult's resources, without the informed consent of the older adult or with consent obtained through misrepresentation, coercion or threats of force, that results in monetary, personal or other benefit, gain or profit for the perpetrator or monetary or personal loss to the older adult.

*Id.* at § 10225.103.

conversations, Attorney Potts filed a report with the Delaware County Office of Services for the Aging ("COSA") in September of 2011. COSA case manager, Jamilla Allen ("Ms. Allen"), opened an investigation and met with Decedent on September 12, 2011. At the meeting, Decedent asked Ms. Allen for more time to consider what she wanted to do with her estate. Ms. Allen and Decedent agreed to meet again on September 21, 2011. Neither Attorney Potts nor anyone from COSA, including Ms. Allen, contacted Decedent from September 12 through September 21, 2011; however, during that period, Niece repeatedly contacted Decedent by telephone.

Ms. Allen met with Decedent on September 21, 2011, as scheduled. As a result of that meeting, Attorney Potts met with Decedent the next day and prepared a will ("September 2011 Will") reflecting Decedent's earlier wills. Consistent with Decedent's prior wills, the September 2011 Will made a specific bequest of $50,000 to Niece, distributed the majority of Decedent's estate to the Charities as residuary beneficiaries, and named Attorney Potts as executor with no benefit or discretion as to distribution of the estate. COSA closed its investigation on October 7, 2011.

Decedent passed away on September 20, 2012. Six days later, the Delaware County Register of Wills admitted the September 2011 Will to probate. Niece filed a petition for citation *sur* appeal, alleging undue influence and fraud. Petition for Citation Sur Appeal, 6/18/13, at ¶ 71. The Charities filed preliminary objections, which the orphans' court denied on

October 25, 2013. After the filing of answers and extensive discovery, Niece filed a motion for summary judgment solely on her undue-influence claim, and the Charities filed a motion for summary judgment on both of Niece's claims. Motion of Petitioner for Summary Judgment, 11/20/14; The Charities' Motion for Summary Judgment, 12/8/14. The orphans' court held oral argument on January 16, 2015; it then granted the Charities' motion for summary judgment and denied Niece's competing motion on February 6, 2015. Order of Court, 2/10/15. Niece filed timely exceptions to the order pursuant to Pa.O.C.R. 7.1 on February 27, 2015, which the orphans' court denied on March 25, 2015. This timely appeal followed on April 22, 2015.

Niece presents the following questions for our consideration:

1. Did the Orphans' Court err in denying a Motion for Summary Judgment in favor of a contestant in a will contest where that contestant demonstrated that:

   a. the testator was falsely advised that her niece, a beneficiary of her existing will, was stealing from her;

   b. the contested will was made hastily prior to a pending emergency psychiatric evaluation of the testator;

   c. that emergency evaluation conducted just days after the will was signed found the testator to be unable to handle her own affairs;

   d. those participating in the procuring of the will incorrectly claimed that the testator wished to cut off all contact with the disfavored niece; and

   e. on the basis of that incorrect claim, those procuring the new will attempted to prevent the disfavored niece from contacting testator?

2. Did the Orphans' Court err in denying a Motion for Partial Summary Judgment in favor of contestant that [sic] the three-part test to impose a burden on the proponents of the contested will was not met, where the contestant demonstrated that the testator suffered from a weakened intellect, had a confidential relationship with the proponent, and the proponent derived a substantial benefit from the making of the new will?

3. Did the Orphans' Court err in entering summary judgment against the contestant, both as to her claims of fraud and undue influence, and as to her alternative claim that the Court should shift the burden of proof to the proponents of the will?

Niece's Brief at 4.[4]

The scope and standard of review on appeal from a decree of the orphans' court in a will contest are as follows:

The record is to be reviewed in the light most favorable to [the contestant], and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside. ***In re Bosley***, 26 A.3d 1104, 1107 (Pa.Super. 2011) (internal citations omitted).

_____

[4] We discern only the slightest correlation between Niece's statement of questions presented and the argument section of her brief in contrast to Pa.R.A.P. 2119(a), which provides, "The argument shall be divided into as many parts as there are questions to be argued." However, because Niece is clearly challenging the denial of her motion for summary judgment and the grant of the Charities' motion for summary judgment, we prefer to address the various claims she raises within the framework of her questions presented.

*In re Estate of Schumacher*, 133 A.3d 45, 49–50 (Pa. Super. 2016); *see also In re Estate of Harrison*, 745 A.2d 676, 678 (Pa. Super. 2000) (noting that standard of review of decree of orphans' court is deferential). "Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion." *Estate of Pendergrass*, 26 A.3d 1151, 1153 (Pa. Super. 2011) (quoting *In re Estate of Harper*, 975 A.2d 1155, 1158 (Pa. Super. 2009)) (internal citation omitted).

Additionally, we review the grant of summary judgment according to the following standards:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Michael Salove Co. v. Enrico Partners, L.P.*, 23 A.3d 1066, 1069 (Pa.Super.2011) (citation omitted).

***In re Estate of Hooper***, 80 A.3d 815, 818 (Pa. Super. 2013).

In her first question presented, Niece argues that the orphans' court erred in denying her motion for summary judgment because she presented clear and convincing evidence of undue influence directly exerted upon Decedent. Niece's Brief at 31–33. Specifically, Niece submits the following as evidence supporting her claim: (a) Decedent was falsely advised that Niece was stealing from her, ***id.*** at 42; (b) the contested will was made hastily prior to a pending emergency psychiatric evaluation of the testator, ***id.*** at 32; (c) an emergency evaluation conducted just days after the September 2011 Will was signed found Decedent unable to handle her own affairs, ***id.*** at 44; (d) Attorney Potts and COSA incorrectly claimed that Decedent wished to cut off all contact with Niece, ***id.*** at 48; and (e) on the basis of that incorrect claim, those procuring the new will attempted to prevent the disfavored niece from contacting testator, ***id.*** at 33.

> Our Supreme Court has defined undue influence as follows:
>
> The word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, but to control acquired over another that virtually destroys his free agency. . . . In order to constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will. ***In re Estate of Ziel***, 467 Pa. 531, 359 A.2d 728, 733 (1976) (citations omitted).

***Estate of Schumacher***, 133 A.3d at 52.

Relying on the definition of undue influence expressed in ***In re Estate of Ziel***, 467 Pa. 531, 359 A.2d 728, 733 (1976), the orphans' court disposed of this claim with the following analysis:

> In the present matter, [Niece] strongly believes that there is evidence of direct undue influence sufficient to meet the definition [set forth in Ziel]. To support this argument, [Niece] relies on COSA's investigation of the Decedent's situation based on the report of [Attorney Potts]. According to [Niece], [Attorney Potts] was appalled by the August 18, 2011 Will which was prepared by Edward Glickman, Esquire because it did not reflect the testamentary plan that [Attorney Potts] wanted in place for the Decedent. To correct this, [Niece] argues, [Attorney Potts] reported to COSA, a government agency, how the Decedent was being exploited by [Niece] in order to make COSA [Attorney Potts'] de facto agent. As his agent, the COSA primary care manager, Ms. Allen, under the auspices of the government agency, then reported the allegation that [Niece] was financially exploiting the Decedent to the Decedent who, in her weakened and elderly state, believed them without question. Once appropriately shocked by the actions of [Niece], as reported, the Decedent immediately changed her will to rid it of the exploitation. [Niece] adamantly argues that, at that time, the Decedent was profoundly impaired and thus more prone to influence as evidenced by the report of [Niece's] doctor, Dr. Barry Rovner, who reviewed the medical records of the Decedent as well as Dunwoody Village reports and the depositions [of] Ms. Allen and [Attorney Potts].
>
> This theory is not supported by the record despite the fact that the record in this matter is vast and thorough because the parties were granted near unlimited discovery. Instead, a recitation of the record does not raise any genuine issue of material fact that there was "imprisonment of the body or mind . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy her free agency and to operate as a present restraint upon her in the making of the September 22, 2011 Will" which Ziel's Estate, quoted and cited above, informs us to be the standard for meeting the burden of proving under influence directly. Instead, the record reflects a carefully

thought out course of action undertaken by [Attorney Potts] to understand the Decedent's testamentary wishes and to effectuate them without influencing the Decedent in any way.

Orphans' Court Opinion Sur Summary Judgment, 2/6/15, at 7–8. The orphans' court continued with a thorough recitation of factual findings and the following conclusion:

> Despite ample, unfettered discovery and despite giving [Niece] the benefit of all reasonable inferences, there is nothing in the record that comes close to clear and convincing evidence of direct undue influence as [defined] above. Far from being isolated or imprisoned, the Decedent was residing in Dunwoody Village where nurses and aids were coming and going all the time. In addition, [Niece] regularly contacted the Decedent via telephone and was able to physically visit the Decedent. Despite that access to and conversations with the Decedent, [Niece] never questioned the Decedent's capacity. After the initial meeting with COSA, the Decedent had nine (9) days, which is ample time for any intimidation felt as a result of COSA being involved to dissipate, to consider her wishes. The Decedent's body and mind were not imprisoned, she was not coerced, and her free agency was not destroyed. Instead, her free agency was encouraged and fostered to ensure that her testamentary plan was, in fact, hers and hers alone devoid of any third party influence.
>
> Accordingly, this [c]ourt finds [Niece] has failed to raise any genuine issue of material fact to support her argument of direct undue influence upon the Decedent by [Attorney Potts].

Orphans' Court Opinion, 2/6/15, at 10.

Upon review of the certified record, we find support therein for the orphans' court's findings. Moreover, we find support in the law and the record for the orphans' court's analysis and conclusion, which we adopt as our own. Orphans' Court Opinion, 2/6/15, at 6–10.

- 10 -

We write separately to address Niece's more specific arguments. Niece complains that the orphans' court used an incorrect standard of review for summary judgment. Niece's Brief at 36. She challenges the orphans' court's use of the phrase, "there is nothing in the record that comes close to clear and convincing evidence of direct undue influence." Orphans' Court Opinion Sur Summary Judgment, 2/6/15, at 10. This argument lacks merit. Upon reading the orphans' court's analysis as a whole, we reach the same conclusion it did in rejecting Niece's third exception: "[T]he statement that the evidence 'did not come close to clear and convincing evidence of undue influence' has the clear meaning that no genuine issue of material fact of undue influence was raised to proceed to trial." Orphans' Court Opinion Sur Exceptions, 6/26/15, at 6. The interplay between the burden of proof for establishing undue influence and the standard for summary judgment is straightforward. Because Niece failed to present clear and convincing evidence of undue influence, she failed to raise a genuine issue of material fact to be tried by a jury. *See In re Estate of Clark*, 334 A.2d 628, 632 (1975) ("Generally, undue influence, being somewhat akin to fraud, must be proved by clear and convincing evidence."); *Babb v. Ctr. Cmty. Hosp.*, 47 A.3d 1214, 1223 (Pa. Super. 2012) ("[O]ur responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a

*prima facie* cause of action, such that there is no issue to be decided by the fact-finder.") (citation omitted).

Next, Niece argues that the orphans' court drew unwarranted inferences against her. Niece's Brief at 37. The orphans' court addressed this issue in denying Niece's third exception. Orphans' Court Opinion Sur Exceptions, 6/26/15, at 6–7. Upon review of that analysis and the record, we discern no basis on which to disturb the conclusion of the orphans' court. The record indicates that the orphans' court consistently viewed the evidence, and all reasonable inferences therefrom, in favor of Niece, even when she was the party moving for summary judgment. *See* Orphans' Court Opinion Sur Summary Judgment, 2/6/15, at 12 ("[T]his Court will consider [Niece] to be the nonmoving party so that she may receive the benefit of any and all reasonable inferences.").

Niece also argues that the orphans' court did not consider all of the evidence related to Decedent's cognitive impairment. Niece's Brief at 44. Our review of the certified record belies Niece's argument and confirms the conclusion reached by the orphans' court in rejecting Niece's first exception:

> Exception #1 reads as though [Niece] challenged the testamentary capacity of the Decedent and the [c]ourt improperly ruled on that cause of action. That simply is not the case. The only two (2) causes of action before the [c]ourt on the Summary Judgment Motions were fraud and undue influence. With respect to those causes of action, the [c]ourt did consider the evidence submitted regarding the Decedent's cognitive state and the Opinion entered on February 6, 2015 reflects that consideration.

Orphans' Court Opinion Sur Exceptions, 6/26/15, at 5.

Lastly, Niece argues that the orphans' court erred in rejecting evidence of Attorney Potts' efforts to isolate Decedent. Niece's Brief at 48. The orphans' court rejected this argument, and so do we, with the following analysis:

[Niece] argues that, from August 18 to September 22, when the [September 2011 Will] was executed, [Niece] was in Colorado and was unaware that COSA had opened an investigation regarding the Decedent. That fact does nothing to suggest that the Decedent was isolated from [Niece]. It only serves to suggest what [Niece] was or was not aware of which is irrelevant to determining whether there was a genuine issue of material fact of undue influence. [Niece] may not have been aware of COSA's involvement but, the record presented to this [c]ourt and outlined in the February 6, 2015 Opinion, reveals that [Niece] had unfettered access to the Decedent from August 18 to September 22 and even contacted the Decedent at least ten (10) times between September 8 and September 22. Such access supports the [c]ourt's finding that the Decedent was not isolated from [Niece].

[Niece] also argues that the Decedent was isolated because [Attorney Potts] caused the Decedent to sign a letter, just after executing the September 22 Will, stating that the Decedent wished to have no further contact with [Niece]. Again, this does not support a finding of isolation that would raise a genuine issue of material fact that the Decedent was unduly influenced. To raise a genuine issue of material fact of undue influence, [Niece] must point to an example of isolation prior to the execution of the September 22 Will would could have caused the execution. By citing the letter, [Niece] only points out a statement of the Decedent's desire to not have contact with [Niece] after the September 22 Will had been executed.

Orphans' Court Opinion Sur Exceptions, 6/26/15, at 7–8.

In her second question presented, Niece argues that the orphans' court erred in denying her motion for partial summary judgment because

she satisfied the tripartite test for shifting the burden of proving undue influence. Niece's Brief at 33, 51. According to Niece, she established that: (1) Decedent suffered from a weakened intellect and diminished capacity; (2) Attorney Potts had a confidential relationship with Decedent; and (3) Attorney Potts derived a substantial benefit just from making the September 2011 Will according to his purposes, not Decedent's.[5] This evidence, Niece concludes, shifted the burden to the Charities "to prove that the September [2011] Will was not the product of undue influence." *Id.* at 33.

Contrarily, the Charities and the Commonwealth argue that the orphans' court did not err in denying Niece's motion for partial summary judgment because she presented no evidence of undue influence; therefore, the burden did not shift. Specifically, the Charities and the Commonwealth insist that, because Attorney Potts did not receive anything under the September 2011 Will and had no discretion in distributing the estate pursuant thereto, Niece failed to meet her burden of proof. The Charities' Brief at 36–45; Commonwealth's Brief at 25–32.

"The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof." *Estate of Clark*, 334 A.2d at 632. We recently explained:

---

[5] No one disputes that the substantial-benefit factor is the sticking point in this case.

In making a will, an individual may leave his or her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she "lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." *In re Johnson's Estate*, 370 Pa. 125, 127, 87 A.2d 188, 190 (1952). If an individual challenges a will on any of these bases, the burden is on the proponent of the will to present evidence of the formalities of probate. *In re Clark's Estate*, 461 Pa. 52, 59, 334 A.2d 628, 631 (1975). Once the proponent presents this evidence, a presumption of validity arises, and the burden shifts to the person contesting the will to prove that the testator lacked mental capacity, or the will was obtained by forgery, fraud, or undue influence, or was the product of an insane delusion. *See In re Bosley*, 26 A.3d at 1107.

*In re Estate of Nalaschi*, 90 A.3d 8, 11–12 (Pa. Super. 2014). In the specific context of undue influence, the burden of proof is assigned as follows:

Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. [*Estate of Clark*, 334 A.2d] at 632. The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. *Id.* Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. *Id.*

*In re Estate of Smaling*, 80 A.3d 485, 493 (Pa. Super. 2013).

Mindful of the burden-shifting standard for claim of undue influence, the orphans' court opined as follows:

If direct undue influence cannot be proven by clear and convincing evidence, the contestant of a will may still attempt to shift the burden to the proponent of a will to prove the lack of undue influence. <u>Clark</u>, [334 A.2d 628]; <u>Smaling</u>, 80 A.3d 485.

\* \* \*

In the instant matter, [Niece] has both filed a motion for summary judgment and had a motion for summary judgment filed against her to which she filed a response. For purposes of this section, this [c]ourt will consider [Niece] to be the nonmoving part so that she may receive the benefit of any and all reasonable inferences. In that light, it is possible to infer that the first two (2) elements, weakened intellect and confidential relationship, of the three-part burden shifting test have been met[4] for purposes of analyzing the Motion for Summary Judgment. Nevertheless, even proceeding as if the first two elements are met, [Niece] has failed to raise a genuine issue of material fact that there is clear and convincing evidence of a substantial benefit to [Attorney Potts].

> [4] This is merely for the sake of argument and analysis and in no way reflects a conclusion of law reached by this Court. This Court chooses not to analyze the element of weakened intellect or confidential relationship because the record is completely devoid of evidence of a substantial benefit to [Attorney Potts].

[Niece] argues [Attorney Potts] received a substantial benefit because he was strongly motivated to have the Decedent execute a will which reflected his, not the Decedent's, preferred testamentary plan. There is no case law to support this argument that motivation to modify a will equals a substantial benefit. Rather, the case law demonstrates that a substantial benefit is what motivates one to change a will. Motivation in and of itself is not a substantial benefit but, rather, a substantial benefit produces motivation to change a will.

The September 22, 2011 Will names [Attorney Potts] executor but grants him no discretion as to how the estate is distributed and makes no bequest to [Attorney Potts]. That being the case, there is not even a substantial collateral benefit let alone a substantial benefit. Unlike [<u>In re Estate of</u>] <u>LeVin</u>,

[615 A.2d 38, 42 (Pa. Super. 1992), [Attorney Potts] does not receive significant, ongoing compensation for his role as executor and [Attorney Potts] does not have any discretion in distributing the estate. Unlike [In re Button's Estate, 328 A.2d 480 (Pa. 1974), Attorney Potts] has no relationship with the primary beneficiaries similar to the parent-child relationship in Button which would motivate him to ensure that those beneficiaries receive the majority of the estate.

Orphans' Court Opinion Sur Summary Judgment, 2/6/15, at 12–13. The orphans' court then concluded:

Accordingly, this [c]ourt finds that [Niece] has failed to raise a genuine issue of material fact that there is clear and convincing evidence of a substantial benefit. Because evidence of the element of substantial benefit is so completely absent, this Court finds it unnecessary to discuss the elements of weakened intellect and confidential relationship.

*Id.* at 13. Notably, the orphans' court reached the same conclusion in disposing of Niece's eighth and ninth exceptions:

This [c]ourt appropriately inferred, to the benefit of [Niece], that weakened intellect and confidential relationship, two (2) of the three (3) elements necessary to shift the burden, were satisfied and appropriately found that there was no genuine issue of material fact that [Attorney Potts] received a substantial benefit based upon the record presented. Given the lack of a genuine issue of material fact as to the necessary element of substantial benefit, summary judgment was appropriate and an affirmative finding as to the other two (2) elements was unnecessary.

\* \* \*

[Niece] also argues that [Attorney Potts'] substantial benefit was the testamentary scheme that he desired for the Decedent which was accomplished with the September [2011] Will. However, as was outlined in [the court's] February 6, 2015 opinion, obtaining a testamentary scheme, without more, is not a substantial benefit. In fact, in [Niece's] attempt to argue that the motivation to obtain a certain testamentary scheme and obtaining said testamentary scheme equals a substantial benefit,

> [Niece] contradicts herself and echoes this [c]ourt's logic by stating that "the substantial benefit that he will gain by the terms of the will is what motivates him to seek to have the testator sign such will. (Exceptions to Adjudication on Motions for Summary Judgment p. 12). This is precisely the logic behind this [c]ourt's finding that [Niece] failed to raise a genuine issue of material fact that there was a substantial benefit. The motivation to change a will does not equal a substantial benefit as [Niece] argued before contradicting herself. Rather, the substantial benefit is what creates the motivation to change the will. The testamentary scheme of the September [2011] Will does not confer a substantial benefit upon [Attorney Potts].

Orphans' Court Opinion Sur Exceptions, 6/26/15, at 9–11.

Upon review, we discern no legal error or abuse of discretion. *Estate of Shumacher*, 133 A.3d at 49–50. Attorney Potts was designated executor under the September 2011 Will, not a beneficiary. His position as executor, without more, did not confer a substantial benefit. *See In re Estate of Stout*, 746 A.2d 645, 649 (Pa. Super. 2000) (holding that "receipt of commissions received for executor's service to the estate is not enough to establish substantial benefit"). Moreover, as executor, Attorney Potts was not given any latitude or discretion in distributing Decedent's assets. Decedent was specific in all of her devises and bequests, leaving no room for any exercise of discretion as to the identity of beneficiaries or the amount of their gifts. Additionally, Decedent created no ongoing authority under which Attorney Potts might maintain control of Decedent's assets for any significant duration. *Compare In re Estate of LeVin*, 615 A.2d 38, 43 (Pa. Super. 1992) (holding that substantial benefit accrued to executor/testamentary trustee where he was vested with power to select

beneficiaries, revise terms of testamentary trust, invest, sell or dispose of trust assets; and determine when/if trust became impracticable to administer). Although the September 2011 Will contains boilerplate language granting Attorney Potts the authority and powers necessary to effectively administer and distribute Decedent's assets, in reality, Attorney Potts possessed little to no latitude in the ultimate distribution of the assets of the estate. Petition for Citation Sur Appeal, 6/18/13, at Exhibit 1.

Nor are we persuaded by Niece's novel "motive, means, and opportunity" theory. Niece's Brief at 31. As the Charities contend, "[i]t is a made-up legal theory and [Niece] cannot cite any case law to support." The Charities Brief at 40. Indeed, the case Niece does cite, **In re Miller's Estate**, 108 A. 616 (Pa. 1919), is factually distinguishable. Therein, the Supreme Court explained that the burden would shift to the will's proponent "[w]here a person has testamentary capacity, but is so weak physically or mentally as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him." **Id.** at 616.[6] The substantial benefit in **Miller** was a residuary bequest to the testator's physician/executor. **Id.** at 617.

_____

[6] Niece also cites **In re Estate of Button**, 328 A.2d 480 (Pa. 1974), in support of her substantial benefit argument. Niece's Brief at 53. We distinguish **Estate of Button** for the reasons set forth by the Charities in
*(Footnote Continued Next Page)*

- 19 -

In sum, we agree with the orphans' court that Attorney Potts did not receive a substantial benefit under the September 2011 Will. Consequently, Niece failed to shift the burden of proving undue influence to the Charities.

In her final issue, Niece argues that the orphans' court erred in granting the Charities' motion for summary judgment on all her claims. Having disposed of Niece's undue influence claims, we are left with the fraud claim. Notably, Niece does not present a separate argument regarding fraud in her appellate brief. To the extent she raises such a claim, it appears within the folds of her direct undue influence analysis. Niece's Brief at 28–33. In response, the Charities argue that the orphans' court did not err in granting its motion for summary judgment because Niece presented no evidence of fraud. The Charities' Brief at 36–45.

Viewing the evidence in favor of Niece as the non-moving party and giving her the benefit of all reasonable inferences therefrom, the orphans' court analyzed Niece's fraud claim as follows:

> [Niece] argues that [Attorney Potts], in his report to COSA, misstated that [Niece] had exploited and/or influenced the Decedent into changing the Decedent's will. This accusation is not borne out in the record.
>
> There is no evidence that [Attorney Potts] intentionally misstated any facts. The record reveals that it was Ms. Allen, on behalf of COSA, who told the Decedent that there was a report

_(Footnote Continued)_ ────────────────

their appellate brief, **see** Charities' Brief at 36–37 ("*Button's Estate* is unavailing to [Niece] for at least three reasons."), and by the orphans' court, **see** Orphans' Court Opinion Sur Summary Judgment, 2/6/15, at 12–13.

- 20 -

that [Niece] was financially exploiting her. [Attorney Potts] reasonably reported his concerns to COSA based on the fact that the August 18, 2011 Will was drastically inconsistent with the Decedent's prior wills and the fact that [Niece] obtained a different attorney to draft the will after [Attorney Potts], the Decedent's long-time estate attorney, insisted on meeting the with [sic] Decedent alone to review the proposed changes.

Even accepting, for purposes of summary judgment review, that the Decedent believed the statement that [Niece] was financially exploiting her, there is no evidence that the Decedent would not have made the same bequests had she known the truth. The record reveals just the opposite. The Decedent executed six (6) wills prior to the Will at issue—the September 22, 2011 Will. Five (5) of those (6) wills were virtually identical to the will at issue. In addition, [Niece] continued to have telephone contact with the Decedent during this period of time and the Decedent continued to take [Niece's] calls which belies the allegation of animosity created by the COSA primary care manager, Ms. Allen.

Orphans' Court Opinion, 2/6/15, at 5–6.

Upon review, we find support in the law and the record for the orphans' court's conclusion that Niece's fraud claim lacked merit. We recently reiterated that:

[g]enerally speaking, fraud with respect to a will consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture, by which a person is deceived to his or her disadvantage. However, **to invalidate a will, the fraudulent act must have the effect of misleading the testator, which can occur only if the testator relies on it.** Thus, if the testator to whom a misrepresentation was made knew the truth at the time he or she executed the will, it cannot be said that the testator relied on such representation, and fraud is not established. In order to establish that a will was fraudulently induced, it must also be shown that: (1) the testator had no knowledge of the concealed

- 21 -

or misstated fact; and (2) the testator would not have made the same bequest had he or she known the truth.

*In re Estate of Sacchetti v. Sacchetti*, 128 A.3d 273, 288–289 (Pa. Super. 2015) (quoting 31 Standard Pennsylvania Practice 2d § 148:76 (emphasis supplied; footnotes and illustration omitted)).

Significantly, the orphans' court:

never made a finding that false accusations were made to the Decedent. In addition, [the c]ourt found that, regardless of what statements were made to the Decedent, there was strong evidence that the Decedent would have made the same bequests given that five (5) of the six (6) wills executed by the Decedent prior to the September [2011] Will had virtually identical distribution schemes.

Orphans' Court Opinion Sur Exceptions, 6/26/15, at 8. The record before us confirms that Attorney Potts did not mislead Decedent and cause her to execute the September 2011 Will through fraud. Rather, as Decedent's long-term attorney and the scrivener of her four previous wills, Attorney Potts thought the Decedent "could have been subject to undue influence by [Niece] to change her will leaving the residue of her estate outright to [Niece]" and not to the Charities. N.T. (Potts Deposition), 6/25/14, at 49–52, 68. As the Charities point out, Niece's position "ignores [Decedent's] testamentary history, which is entirely consistent with the challenged Final Will." The Charities' Brief at 6 (citing *Burns v. Kabboul*, 595 A.2d 1153, 1162 (Pa. Super. 1991) ("It is well-settled that a prior will containing the same testamentary disposition is strong evidence against undue influence.")). Moreover, there is no indication that Decedent relied on

- 22 -

any allegedly disparaging statements about Niece. Indeed, the record suggests otherwise in two regards. First, Decedent had a personal relationship with Niece and, therefore, knew exactly how Niece treated her. Second, despite any allegations concerning Niece's conduct toward Decedent, Decedent still bequeathed Niece $50,000 under the September 2011 Will.

Troubled by the about-face in Decedent's testamentary direction, Attorney Potts consulted with experts in the fields of legal ethics and estate planning. Based on their advice, he contacted COSA and reported his concern that Niece may have been financially exploiting the Decedent. N.T. (Potts Deposition), 6/25/14, at 23–33. In turn, Ms. Allen conducted a legally mandated investigation. *See* 34 P.S. § 10225.303(a) (requiring agency to investigate a report within seventy-two hours after receipt, and to determine whether the report is substantiated or unsubstantiated; if the latter, the agency is to provide protective services to the older adult). Attorney Potts had no contact with Decedent during COSA's investigation, nor did Ms. Allen. N.T. (Potts Deposition), 6/25/14, at 170. Attorney Potts became involved again only after Decedent told Ms. Allen that she wanted a new will, which Attorney Potts then prepared. *Id.* at 45. Finally, as discussed above, the evidence Niece cites in support of her argument that Attorney Potts prevented her from contacting Decedent occurred after execution of the

September 2011 Will.  Appellant's Brief at 16–21.  As such, it does not support Niece's fraud claim.  **Estate of Nalaschi**, 90 A.3d at 13.

In sum, we agree with the orphans' court that Niece failed to establish by clear and convincing evidence that (a) Attorney Potts exerted undue influence on Decedent, (b) Attorney Potts obtained a substantial benefit under the September 2011 Will, or (c) Attorney Potts committed fraud, causing Decedent to execute the September 2011 Will.  Because Niece failed to satisfy her burdens of proof or to shift the burden to the Charities, we further agree with the orphans' court that there are no genuine issues of material fact regarding Niece's claims of undue influence or fraud.  Consequently, we conclude that the orphans' court did not err in granting the Charities' motion for summary judgment and in denying Niece's opposing motion.

Order affirmed.

Judge Mundy and Justice Fitzgerald Concur in the Result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/15/2016

- 24 -

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

Estate of Clara Flatow, deceased     :   No. 677 of 2011

## <u>OPINION</u>

This matter came before the Court on a Petition for Citation Sur Appeal From the Decision of the Register of Wills to Admit Will to Probate filed by Samantha Weston (hereinafter referred to as Petitioner) on June 17, 2013. On June 18, 2013, this Court received a certified copy of the Register of Wills file.

In response to the Petition, Preliminary Objections were filed by The New York Public Library, Astor, Lenox and Tilden Foundations, The Sierra Club Foundation and The Salvation Army of New York City (hereinafter referred to as Respondent-Charities), who were named the residuary beneficiaries in the probated Will, and by John Potts, Esquire (hereinafter referred to as Respondent-Scrivener), whom the Petitioner accused of undue influence and fraud. In addition, the Office of the Attorney General, as *parens patriae*, joined the Preliminary Objections filed by the Respondent-Charities.

On October 25, 2013, the Preliminary Objections were denied and, in November of 2013, Answers with New Matters were filed by the Respondent-Charities, the Respondent-Scrivener and the Office of the Attorney General. After a protracted period of discovery during which the Petitioner was ordered to and did file an Accounting of her administration as agent for the Decedent under a Durable Power of Attorney, both the Petitioner and Respondent-Charities filed Motions for Summary Judgment and Responses. Both the Respondent-Scrivener and the Office of the Attorney General joined the Motion and Response filed by the Respondent-Charities.

1

On January 16, 2015, oral argument was held on the Motions for Summary Judgment. For the reasons set forth below, this Court grants the Motion for Summary Judgment filed by the Respondent-Charities and denies the Motion for Summary Judgment filed by the Petitioner.

## I. FACTS

Clara Flatow (hereinafter referred to as Decedent) died on September 20, 2012 at the age of 99. The Decedent's husband died in 1976 and the Decedent never had any children. However, the Decedent had a brother who had three (3) children one of whom is the Petitioner which makes the Petitioner the niece of the Decedent. The Petitioner and the Decedent did not have much of a relationship until 2006 because the Petitioner lived in Colorado[1] and the Decedent lived most of her life in New York City and her final decades in Pennsylvania during which time she resided at Dunwoody Village. In 2006, the Petitioner became involved in the Decedent's life when, after the Decedent's sister died in 2005, the Decedent had no family in Pennsylvania. In August 2010, the Decedent executed a Durable Power of Attorney which named the Petitioner her agent.

Prior to her death, the Decedent executed at least seven (7) wills. The first of those wills was prepared by Pepper Hamilton, LLP and was executed by the Decedent on May 24, 1999. The provisions of that will distributed the residue of the Decedent's estate, the vast majority of her estate, to charities. The next four (4) wills were all prepared by the Respondent-Scrivener and were executed by the Decedent in May 2004, December 2005, December 2007, and June 2011. In each of those wills, the majority of the estate was to be distributed to charities through the residuary clause and the Respondent-Scrivener was named executor with no discretion as to how to distribute the estate property.

In July of 2011, the Petitioner contacted the Respondent-Scrivener and stated that the Decedent wanted to make some changes to her will so a meeting of the Respondent-Scrivener the Petitioner, and the Decedent was scheduled. At that meeting, the Petitioner provided the Respondent-Scrivener with a two-page document which outlined the changes that were to be made to the Decedent's will. Upon review of the proposed changes the Respondent-Scrivener

---

[1] Throughout the entire process of the will contest and at the time of the oral arguments on the Motions for Summary Judgment the Petitioner resided in Colorado.

2

Informed the Petitioner that he would need to meet independently with the Decedent to review the proposed changes with her before modifying the Decedent's will.

After that meeting and instead of allowing the Respondent-Scrivener to meet with the Decedent independently, the Petitioner contacted Edward Glickman, Esquire to prepare a new will for the Decedent. Mr. Glickman met with the Petitioner and the Decedent as a group and with the Decedent individually. Mr. Glickman prepared a new will and the Decedent executed that will on August 18, 2011. That will incorporated the proposed changes and distributed the residue of the Decedent's estate, the majority of her estate, into a trust for the benefit of the Petitioner. It also provided that the Petitioner's husband would be the executor of the estate and the trustee of the trust with absolute discretion to make principal distributions from the trust for expenses incurred by the Petitioner on behalf of herself and her heirs.

The Respondent-Scrivener learned of this new August 18, 2011 will when he received a fax from Mr. Glickman. In response, the Respondent-Scrivener consulted with three (3) attorneys who were all well-respected in their fields – professional responsibility and estate planning – and expressed his concerns that the Decedent may have been financially exploited. After consulting with these attorneys, the Respondent-Scrivener contacted the County Office of Services for the Aging (hereinafter referred to as COSA) in September 2011 and, again, expressed his concerns that the Decedent may have been the victim of financial exploitation particularly with respect to her will and estate plan.

A COSA primary care manager, Jamilla Allen, opened an investigation on September 8, 2011 to determine if the Decedent had been financially exploited. Ms. Allen first met with the Decedent on September 12, 2011 at which time Ms. Allen asked the Decedent questions regarding the allegations made in the report, the Decedent's relationship with the Petitioner, and the Decedent's wishes for her estate. Ms. Allen reported that the Decedent wanted more time to consider what she wanted to do with her estate so Ms. Allen and the Decedent arranged for Ms. Allen to meet with the Decedent again on September 21, 2011. From September 12, 2011 to September 21, 2011, neither Mr. Potts nor anyone from COSA (including Ms. Allen) contacted the Decedent but the Petitioner was still able to contact the Decedent during that time and, in fact, did contact her via telephone during that time. As arranged, Ms.

3

Allen met with the Decedent on September 21, 2011 and again asked the Decedent her wishes for her estate.

As a result of that meeting, Mr. Potts, his law partner, Stephen Potts, and his assistant, Ellen Clinton, met with the Decedent on September 22, 2011 and prepared a will which reflected the Decedent's earlier wills and named the Respondent-Charities residuary beneficiaries. Mr. Potts discussed the key terms and read the document to the Decedent after which the Decedent executed the will. The September 22, 2011 Will named the Respondent-Charities residuary beneficiaries receiving the majority of the Decedent's estate, gave a specific bequest of $50,000.00 to the Petitioner, and named Mr. Potts executor but gave Mr. Potts neither a specific bequest nor any discretion as to how the estate was to be distributed.

COSA closed its investigation on October 7, 2011 and on September 26, 2012, six (6) days after the Decedent's death, the September 22, 2011 Will was admitted to probate.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Orphans' Court may properly consider motions for summary judgment. In re Estate of Kostenbader, 23 Fiduc.Rep.2d 39 (Monr. Co. 2002); Pa.O.C.Rule 3.1. Summary judgment is appropriate when there is no genuine issue of material fact as to a necessary element of the cause of action and the moving party is entitled to relief as a matter of law. Pa.R.C.P. 1035.2(1). When considering a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party, and accepts as true all well-pleaded allegations, giving that party the benefit of all reasonable inferences that can be drawn from those allegations. Kostenbader, 23 Fiduc.Rep.2d 39. However, if the nonmoving party fails to set forth specific facts that demonstrate a genuine issue of material fact for trial, summary judgment shall be entered in favor of the moving party. Pa.R.C.P. 1035.3.

### B. THE PETITIONER HAS FAILED TO RAISE A GENUINE ISSUE OF MATERIAL FACT THAT THE SEPTEMBER 22, 2011 WILL WAS OBTAINED BY FRAUD

Fraud is a trick, artifice or management which induces a person to dispose of her property or to do some act contrary to her wishes, or in such a way as she would not do but for the fraud. See Markantone Will, 16 Fiduc. Rep. 2d 134 (O.C. Allegh. 1996). In order to prove

4

fraud, the contestant of a probated will must show by clear and convincing evidence that the (1) decedent had no knowledge of the concealed or misstated fact, and (2) the decedent would not have made the same bequest had she known the truth. Estate of Paul, 407 Pa. 30 (1962); Cressman Estate, 346 Pa. 400 (Pa. 1943). In Paul, the testatrix's attorney and scrivener of her will received 84 shares of a corporation which amounted to 33% of the testatrix's gross estate. The other beneficiaries under the will challenged the bequest on the basis of fraud alleging that the scrivener had misrepresented to the testatrix that the shares were worth $50.00 each when they were really worth $800.00 each. The challengers contended that the testatrix relied on this misrepresentation and bequeathed the shares to the scrivener never intending to bequeath him such a large percentage of her estate. The Court found no fraud because the record made it clear that the testatrix had intended for the scrivener to be a beneficiary and that the testatrix was an intelligent business woman who would have known that the value of the shares was much more than $50.00. Therefore, the Court found that neither element of fraud had been met.

In the present matter, fraud was addressed only tangentially at the oral argument on the summary judgment motions. Nevertheless, the Petitioner argues that the Respondent-Scrivener, in his report to COSA, misstated that the Petitioner had exploited and/or influenced the Decedent into changing the Decedent's will. This accusation is not borne out in the record.

There is no evidence that the Respondent-Scrivener intentionally misstated any facts. The record reveals that it was Ms. Allen, on behalf of COSA, who told the Decedent that there was a report that the Petitioner was financially exploiting her. The Respondent-Scrivener reasonably reported his concerns to COSA based on the fact that the August 18, 2011 Will was drastically inconsistent with the Decedent's prior wills and the fact that the Petitioner obtained a different attorney to draft the will after the Respondent-Scrivener, the Decedent's long-time estate attorney, insisted on meeting the with Decedent alone to review the proposed changes.

Even accepting, for purposes of summary judgment review, that the Decedent believed the statement that the Petitioner was financially exploiting her, there is no evidence that the Decedent would not have made the same bequests had she known the truth. The record reveals just the opposite. The Decedent executed six (6) wills prior to the Will at issue -- the

5

September 22, 2011 Will. Five (5) of those (6) wills were virtually identical to the will at issue. In addition, the Petitioner continued to have telephone contact with the Decedent during this period of time and the Decedent continued to take the Petitioner's calls which belies the allegation of animosity created by the COSA primary care manager, Ms. Allen. Indeed, after the Will was executed the Decedent continued to want to take the calls of the Petitioner who, by the way, as a result of all the phone calls, never raised a concern about the Decedent being in a profoundly weakened state. Thus, there is evidence that the Decedent would have made the same bequests.

### C. THE BURDEN TO PROVE UNDUE INFLUENCE WAS ON THE PETITIONER

Once the proponent of a will presents evidence of a formally probated will, a presumption of lack of undue influence arises and the burden of producing evidence to support an allegation of undue influence shifts to the contestant of the will. Estate of Clark, 461 Pa. 52 (1975).

In the present matter, the September 22, 2011 Will was admitted to probate by the Register of Wills of Delaware County on September 26, 2012. As such, there is a presumption of a lack of undue influence and the Petitioner, as the contestant of the September 22, 2011 Will, has the burden of proving undue influence. The Petitioner must raise at least one genuine issue of material fact as to that allegation.

### D. THE PETITIONER HAS FAILED TO RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO DIRECT UNDUE INFLUENCE

Undue influence is defined as "imprisonment of the body or mind . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, [t]o such a degree as to prejudice the mind of the testator, to [d]estroy his free agency and to operate as a present restraint upon him in the making of a will." In re Ziel's Estate, 467 Pa. 531 (Pa. 1976). A contestant to a will which has been formally probated can either attempt to meet the burden directly by producing clear and convincing evidence of a situation and/or incident which meets the definition of undue influence or a contestant may attempt to shift the burden to the proponents by showing clear and convincing evidence that (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Clark,

6

461 Pa. 52; In re Estate of Smaling, 80 A.3d 485 (Pa. Super. 2013). The burden of clear and convincing evidence means that mere suspicions, opinions or beliefs not founded on established facts are insufficient to support a charge of undue influence. Id. In addition, Pennsylvania has found that financial benefit from compensation as executor is *de minimis*. In re Peterman's Estate, 367 Pa. 302 (1951).

In the present matter, the Petitioner strongly believes that there is evidence of direct undue influence sufficient to meet the definition quoted above. To support this argument, the Petitioner relies on COSA's investigation of the Decedent's situation based on the report of the Respondent-Scrivener. According to the Petitioner, the Respondent-Scrivener was appalled by the August 18, 2011 Will which was prepared by Edward Glickman, Esquire because it did not reflect the testamentary plan that the Respondent-Scrivener wanted in place for the Decedent. To correct this, the Petitioner argues, the Respondent-Scrivener reported to COSA, a government agency, how the Decedent was being exploited by the Petitioner in order to make COSA the Respondent-Scrivener's de facto agent. As his agent, the COSA primary care manager, Ms. Allen, under the auspices of the government agency, then reported the allegation that the Petitioner was financially exploiting the Decedent to the Decedent who, in her weakened and elderly state, believed them without question. Once appropriately shocked by the actions of the Petitioner, as reported, the Decedent immediately changed her will to rid it of the exploitation. The petitioner adamantly argues that, at that time, the Decedent was profoundly impaired and thus more prone to influence as evidenced by the report of the Petitioner's doctor, Dr. Barry Rovner, who reviewed the medical records of the Decedent as well as Dunwoody Village reports and the depositions Ms. Allen and the Respondent-Scrivener.

This theory is not supported by the record despite the fact that the record in this matter is vast and thorough because the parties were granted near unlimited discovery. Instead, a recitation of the record does not raise any genuine issue of material fact that there was "imprisonment of the body or mind . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, [t]o such a degree as to prejudice the mind of the testator, to [d]estroy [her] free agency and to operate as a present restraint upon [her] in the making of [the September 22, 2011 Will]" which Ziel's Estate, quoted

7

and cited above, informs us to be the standard for meeting the burden of proving undue influence directly. Instead, the record reflects a carefully thought out course of action undertaken by the Respondent-Scrivener to understand the Decedent's testamentary wishes and to effectuate them without influencing the Decedent in any way.

When the Petitioner informed the Respondent-Scrivener that the Decedent wanted to change her will, he did not hesitate to meet with both the Petitioner and the Decedent. Once presented with the proposed changes, the Respondent-Scrivener reviewed them and appropriately informed the Petitioner that he would need to meet with the Decedent alone to review the changes with her before actually drafting them. However, there was no follow-up meeting and the Petitioner, instead, hired Edward Glickman, Esquire to make the proposed changes. Mr. Glickman made those changes and the executed August 18, 2011 Will reflects them.

Upon learning of the August 18, 2011 Will, via fax from Mr. Glickman, the Respondent-Scrivener became concerned that the Petitioner may have exploited and/or influenced the Decedent in some way. Cognizant of his role as the Decedent's attorney, the Respondent-Scrivener knew he possessed privileged information about the Decedent and her affairs. To ensure that he did not act unethically,[2] the Respondent-Scrivener consulted with three (3) attorneys. The Respondent-Scrivener first spoke to Bradley Rainer, Esquire who was well-respected and accomplished in the field of professional responsibility. The Respondent-Scrivener then spoke with Mary Kenney, Esquire of the Pennsylvania Attorney General's Office

---

[2] The record reflects that the Respondent-Scrivener was acting pursuant to Pennsylvania Rule of Professional Conduct 1.14 which reads in pertinent part:

> (a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
>
> (b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian.

Pa. R.P.C. 1.14. Although the Respondent-Scrivener was convinced that the Decedent had testamentary capacity, the Respondent-Scrivener was aware of the Decedent's short-term memory deficits and reasonably believed that the Decedent was at risk of financial harm as a result.

8

and, finally, the Respondent-Scrivener spoke with Joseph Lastowka, Esquire, a well-respected and accomplished estate planning attorney who was also familiar with the ethics code. Based on his discussions with those three (3) attorneys, the Respondent-Scrivener reported his concerns to COSA – particularly the differences between the August 18, 2011 Will and all previous wills executed by the Decedent. Once the Respondent-Scrivener submitted his report to COSA, he removed himself from the situation and let COSA do their job. As such, COSA was not acting as the Respondent-Scrivener's agent. Rather, COSA followed its normal course of action without any consultation with the Respondent-Scrivener. The Respondent-Scrivener purposely did not contact the Decedent directly and purposely did not interfere with COSA's investigation in order to avoid influencing the Decedent.

After the report was filed, Ms. Allen, the COSA primary care manager, opened her investigation on September 8, 2011 and met with the Decedent on September 12, 2011. At that meeting, Ms. Allen introduced herself, explained the purpose of her visit, and asked the Decedent what her wishes were for her estate. The Decedent requested more time to consider her wishes. Ms. Allen respected that request and Ms. Allen and the Decedent arranged for Ms. Allen to return on September 21, 2011. From September 12, 2011 to September 21, 2011, neither the Respondent-Scrivener nor anyone from COSA contacted the Decedent. On September 21, 2011, Ms. Allen met with the Decedent again. The Decedent recognized Ms. Allen and explained that she wanted the Respondent-Scrivener to prepare a new will which reflected the terms and provisions of the wills pre-dating the August 18, 2011 Will. Even if the Petitioner were given the benefit of an inference that COSA was the Respondent-Scrivener's agent, which this Court must do at this summary judgment stage of the proceeding, it is belied by the fact that, in the course of her investigation, Ms. Allen noted that the Decedent wanted more time to consider what she wanted as her testamentary plan and Ms. Allen honored that desire by giving the Decedent nine (9) days with her own thoughts during which time neither the Respondent-Scrivener nor anyone from COSA contacted the Decedent.

After that September 21, 2011 meeting, the Respondent-Scrivener drafted a will reflecting the Decedent's pre-August 18, 2011 wills. On September 22, 2011, the Respondent-Scrivener, accompanied by his law partner, Stephen Potts, Esquire, and his assistant, Ellen

9

Clinton,[3] met with the Decedent who then executed the September 22, 2011 Will. At all times prior to the execution of the September 22, 2011 Will and after, the Petitioner had telephone access to the Decedent but did not visit the Decedent because the Petitioner chose to remain in Colorado. In fact, the record reflects that the Petitioner spoke with the Decedent on the phone at least ten (10) times between September 8, 2011 and September 22, 2011, including the morning of September 22, 2011 just before the September 22, 2011 Will was executed.

Even if this Court were to accept as true the Petitioner's arguments that the Decedent was profoundly impaired when she executed the September 22, 2011 Will and that the Decedent was intimidated by the involvement of COSA as a government agency and, thus, more inclined to believe Ms. Allen as their representative when she said that the Petitioner was financially exploiting the Decedent, the record as outlined above and presented to this Court at oral argument still does rise to the level of undue influence.

Despite ample, unfettered discovery and despite giving the Petitioner the benefit of all reasonable inferences, there is nothing in the record that comes close to clear and convincing evidence of direct undue influence as quoted above. Far from being isolated or imprisoned, the Decedent was residing in Dunwoody Village where nurses and aids were coming and going all the time. In addition, the Petitioner regularly contacted the Decedent via telephone and was able to physically visit the Decedent. Despite that access to and conversations with the Decedent, the Petitioner never questioned the Decedent's capacity. After the initial meeting with COSA, the Decedent had nine (9) days, which is ample time for any intimidation felt as a result of COSA being involved to dissipate, to consider her wishes. The Decedent's body and mind were not imprisoned, she was not coerced, and her free agency was not destroyed. Instead, her free agency was encouraged and fostered to ensure that her testamentary plan was, in fact, hers and hers alone devoid of any third party influence.

Accordingly, this Court finds the Petitioner has failed to raise any genuine issue of material fact to support her argument of direct undue influence upon the Decedent by the Respondent-Scrivener.

---

[3] It is worth noting that, while the Petitioner attempted to prove undue influence directly, the Petitioner did not depose the two (2) people, other than Mr. Potts and the Decedent, who were actually in the room when the September 22, 2011 Will was executed despite having the opportunity to do so.

### E. THE PETITIONER HAS FAILED TO RAISE A GENUINE ISSUE OF MATERIAL FACT SUFFICIENT TO CONSIDER THE UNDUE INFLUENCE THREE PART BURDEN SHIFTING TEST AT TRIAL

If direct undue influence cannot be proven by clear and convincing evidence, the contestant of a will may still attempt to shift the burden to the proponent of a will to prove the lack of undue influence. Clark, 461 Pa. 52; Smaling, 80 A.3d 485. In order to shift the burden to the proponent of a formally probated will, the contestant must show by clear and convincing evidence that (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. Id. For the first element, Pennsylvania courts have defined weakened intellect as:

> [A] mind which, in all circumstances of a particular situation, is inferior to normal minds in reasoning power, factual knowledge, freedom of thought and decision, and other characteristics of a fully competent mentality. It should be viewed essentially as a relative state as the term is applied to cases of undue influence, as these always involve the effect of one intellect upon another; if the intellect is substantially impaired in comparison to that of the proponent or beneficiary it must be regarded as weakened since there could be no equal dealings between the two parties.

Paolini Will, 13 Fiduc. Rep. 2d 185, 187-88 (O.C. Montg. 1993) (quoting Heffner Will, 19 Fiduc. Rep. 542, 546-47). For the second element, "a confidential relationship exists when the circumstances make it certain that the parties do not deal on equal terms, with one side exercising an over-mastering influence over the other." In re King's Estate, 87 A.2d 469, 472 (1952). And for the third element, "'[s]ubstantial benefit' has not been specifically defined by Pennsylvania courts, and whether one receives a substantial benefit is determined on a case-by-case basis." In re Estate of Fritts, 906 A.2d 601 (Pa. Super. 2006). The most typical substantial benefit is direct financial gain by the proponent but a substantial benefit can also be collateral. In re Button's Estate, 328 A.2d 480 (Pa. 1974); In re Estate of LeVin, 615 A.2d 38 at 42 (Pa. Super. 1992). For instance, a substantial collateral benefit exists "where a proponent holds the position of executor and trustee, has control over the entire estate and has a possible residuary interest in the whole estate." In re Estate of LeVin, 615 A.2d 38 at 42 (Pa. Super. 1992). In Button, the Supreme Court found a substantial collateral benefit sufficient to shift the

11

burden because the proponents' children received practically the entire probate estate. In LeVin, the court found that a substantial collateral benefit existed sufficient enough to shift the burden to the proponent of a contested will because the proponent was appointed testamentary trustee with extensive powers over the distribution of the remainder of the testator's $1.5 million estate and with significant compensation.

In the instant matter, the Petitioner has both filed a motion for summary judgment and had a motion for summary judgment filed against her to which she filed a response. For purposes of this section, this Court will consider the Petitioner to be the nonmoving party so that she may receive the benefit of any and all reasonable inferences. In that light, it is possible to infer that the first two (2) elements, weakened intellect and confidential relationship, of the three-part burden shifting test have been met[4] for purposes of analyzing the Motion for Summary Judgment. Nevertheless, even proceeding as if the first two elements are met, the Petitioner has failed to raise a genuine issue of material fact that there is clear and convincing evidence of a substantial benefit to the Respondent-Scrivener.

The Petitioner argues the Respondent-Scrivener received a substantial benefit because he was strongly motivated to have the Decedent execute a will which reflected his, not the Decedent's, preferred testamentary plan. There is no case law to support this argument that motivation to modify a will equals a substantial benefit. Rather, the case law demonstrates that a substantial benefit is what motivates one to change a will. Motivation in and of itself is not a substantial benefit but, rather, a substantial benefit produces motivation to change a will.

The September 22, 2011 Will names the Respondent-Scrivener executor but grants him no discretion as to how the estate is distributed and makes no bequest to the Respondent-Scrivener. That being the case, there is not even a substantial collateral benefit let alone a substantial benefit. Unlike LeVin, the Respondent-Scrivener does not receive significant, ongoing compensation for his role as executor and the Respondent-Scrivener does not have any discretion in distributing the estate. Unlike Button, the Respondent-Scrivener has no

---

[4] This is merely for the sake of argument and analysis and in no way reflects a conclusion of law reached by this Court. This Court chooses not to analyze the element of weakened intellect or confidential relationship because the record is completely devoid of evidence of a substantial benefit to the Respondent-Scrivener.

12

relationship with the primary beneficiaries similar to the parent-child relationship in <u>Button</u> which would motivate him to ensure that those beneficiaries receive the majority of the estate.

Accordingly, this Court finds that the Petitioner has failed to raise a genuine issue of material fact that there is clear and convincing evidence of a substantial benefit. Because evidence of the element of substantial benefit is so completely absent, this Court finds it unnecessary to discuss the elements of weakened intellect and confidential relationship.

## III. CONCLUSION

There was extensive discovery in this matter and the only arguments offered by the Petitioner are that COSA, a government agency, acted as the Respondent-Scrivener's agent to directly unduly influence and/or defraud the Decedent when she was profoundly impaired and that, at the very least, the evidence is sufficient to shift the burden to the proponent because the Respondent-Scrivener was highly motivated to have the Decedent execute a will which reflected his desired testamentary plan. However, based on the law cited, the record presented and the reasons set forth above, this Court finds that the Petitioner has failed to raise a genuine issue of material fact sufficient to proceed to trial on the issue of direct undue influence or fraud and has failed to raise a genuine issue of material fact as to the undue influence three-part burden shifting test sufficient to allow this matter to proceed to trial.

Accordingly, this Court enters the attached Final Decree which DENIES the Motion for Summary Judgment filed by the Petitioner and GRANTS the Motion for Summary Judgment filed by the Respondent-Charities and joined by the Respondent-Scrivener and the Office of the Attorney General.

DATED: 2-6-2015

BY THE COURT:

CHAD F. KENNEY
President Judge

13

## IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## ORPHAN'S COURT DIVISION

Estate of Clara Flatow          :   No. 677 of 2011

                                :

                                :

## FINAL DECREE

AND NOW, this 6TH day of **February, 2015**, based upon the Motions for Summary Judgment, the **Responses** thereto, and oral argument thereon, it is hereby **ORDERED** and **DECREED** that the Motion for Summary Judgment filed by the Petitioner, Samantha Weston, is **DENIED** and the Motion for Summary Judgment filed by the Respondents, the New York Public Library, **Astor**, Lenox and Tilden Foundations, The Sierra Club Foundation and The Salvation Army of New York City, and joined by John Potts, Esquire and the Office of the Attorney General is **GRANTED**.

It is further **ORDERED** that all discovery produced in this matter shall be made part of the record and marked as discovery documents. The parties to this proceeding shall review the Orphans' Court to ensure that all discovery documents are part of the record.

BY THE COURT:

CHAD F. KENNEY
President Judge

14